### BERNARD FRIERY, plaintiff in error, *vs.* THE PEOPLE, defendants in error.

The statutory regulations for the drawing and summoning of jurors were not made for the benefit of parties to trials by jury and for the purpose of securing to such parties (in civil and criminal proceedings) an impartial array of jurors from which the jury to try the issue might be taken, but were made for the purpose of securing an impartial distribution among citizens of the onerous duty of performing jury service.

Hence, in the absence of any suggestion of fraud or of misconduct, other than the mere failure to observe the regulations, the public, only, can complain that the regulations have been disregarded. A challenge to the array, by a prisoner on trial, will not lie for a disregard of the directions of the statute.

The property or assessment qualifications of jurors, prescribed by the Revised Statutes, have been repealed, in respect to the city of New York.

Where jurors are challenged for principal cause or for favor, and upon the triors finding against the challenges, the jurors are challenged peremptorily, by the prisoner, the questions raised previous to the peremptory challenges are not open for examination at the instance of the prisoner.

Intoxication is never an excuse for crime. Even where intent is a necessary ingredient in the crime charged, so long as the offender is capable of con-

Friery *v.* The People.

ceiving a design, he will be presumed, in the absence of proof to the contrary, to have intended the natural consequences of his own act.

Where the killing of another is unequivocal and unprovoked, the fact that it was committed while the perpetrator was intoxicated cannot be allowed to affect the legal character of the crime.

ERROR to the New York general sessions, to review a conviction of the plaintiff in error, for the murder of Henry Lazarus, charged to have been committed on the third day of January, 1865.

The prisoner complained of certain errors alleged to have been committed on the trial, in respect to the organization of the jury, the rulings of the court as to evidence, and the charge of the court to the jury.

On the trial the prisoner challenged the array of one thousand jurors returned by the sheriff, being an extra panel ordered by the court. The causes of challenge to the array (eight in number) relate to the bias of the sheriff and to the mode of drawing and summoning of the jurors, and were claimed by the prisoner to be in direct violation of the statute relating to the summoning and drawing of jurors. The prosecution demurred to the challenge, and the court sustained the demurrer.

The prisoner also challenged, for principal cause and for favor, several jurors. The objections made to them individually appear in the points. The prisoner insisted that errors were committed by the court on these challenges. The prisoner challenged several jurors for principal cause and for favor, who were, notwithstanding his objections, admitted to be good jurors, and he then challenged certain jurors peremptorily. The prisoner, before the calling of the last juror impanneled, had exhausted all his peremptory challenges.

After the jury was impanneled, a case substantially as follows was presented to the jury. Friery and the deceased Lazarus kept drinking saloons near to each other, in East Houston street, in the city of New York. On the morning of January 3, 1865, between three and four o'clock,

Friery *v.* The People.

two men drove up in a sleigh to Friery's place, where they
remained about five minutes. They came out with Friery,
who had been "beastly drunk" during the night before,
and had been drinking hard for a week. The party went
into Lazarus' drinking saloon. Lazarus, who was also
under the influence of liquor, so much so that his bar-
keeper, Connell, wanted to get him off to home and to
bed, was in the bar-room with two other men. California
Jack, one of Friery's companions, offered to bet that he
had a man who could lick any other man there. Lazarus
took up the challenge and offered to fight any man there,
at the same time taking off a handkerchief, in which his
hand was wrapped up. There was some tendency to dis-
turbance, but no blows were struck. The bar-keeper
turned round to get some cigars, and he heard Friery say,
"You are a good little man, Harry," and as the bar-
keeper turned back to the counter, Friery had just drawn
a knife out of Lazarus' neck. There never was any per-
sonal difficulty between the prisoner and deceased. The
evidence showed that both parties were grossly intoxicated
at the time of the homicide. On the morning preceding
the alleged murder the prisoner came into Lazarus' place,
between four and five o'clock; he was drunk at the time,
and had a two-edged dagger knife which he stuck into the
counter, saying, that "will be the death of somebody here
before long," or "sombody yet," or "some son of a bitch
yet." Lazarus was not there at this time. On another
occasion, two weeks before the homicide, Friery came into
Lazarus' place drunk, when there was a large dog lying
sick at the time under the table in the bar-room. Friery
took an ice pick out of his pocket and commenced beating
the dog, and jabbed the sharp end of the pick down the
dog's mouth and broke out some of his teeth, saying that
he could make the dog sing. All this evidence was ob-
jected to by the prisoner. There was no evidence that
Friery knew the dog to belong to Lazarus; and there was

another dog belonging to the bar-keeper about the place at the same time. Evidence was also given as to Friery's conduct on the evening of January 2, 1865, between six and ten o'clock, showing that he took a mustard cup and threw it across the room. This was also objected to by the prisoner.

The court charged the jury, among other things, as follows:

"It does not appear by the evidence in this case that any personal quarrel had occurred between the prisoner and the deceased at any time prior to the occurrence which resulted in the death. Certain things have been proven upon the trial to have occurred in the place kept by Lazarus, and to these I shall briefly call your attention. One scene, you recollect, described by the witness, as when the prisoner at the bar was leaning against the counter and drew a dagger or knife from his pocket, plunged it into the counter, and made the remark, that this 'will be the death of some one yet.' One of the witnesses said, 'some one here,' or 'about here,' but he was not sure on cross-examination whether the word 'here' was used or not, or whether the expression was, 'this will be the death of some one, or some son of a bitch yet.' Another was the occurrence of the beating of the dog, when the sick dog lay under the table, near the stove, in Lazarus' place. The prisoner at the bar came in there in a state of partial intoxication, and with an ice pick beat the dog upon the head, and afterwards knocked out his teeth. The other was the occurrence when the prisoner came into the saloon, and, after taking a drink, seized a mustard cup from the lunch table and threw it against the wall. Those three occurrences have been proven here on the part of the prosecution to show, as is claimed by them, that at the times mentioned, feelings of hostility existed on the part of the prisoner against the deceased, and as bearing upon the question of malice in the commission of the act with which

he is charged. Now, I told the counsel, in your hearing, when these facts were offered in evidence, that in my judgment of the law any act of the prisoner, in reference to the deceased or the property of the deceased, at any time shortly before this fatal occurrence, was admissible in evidence as bearing upon the question of malice; but what degree of importance is to be attached to these acts is for you to say. For instance, the affair in regard to the dog. Unless the prisoner knew that it was Lazarus' dog, any act of his towards it would be of no importance whatever in this case. If he knew it to be Lazarus' dog, or had good reason to believe it was, and then exercised towards it this cruel treatment, it would be a question for you to determine whether his treatment of the dog was an act indicative of personal hostility to Lazarus, or whether it was a mere act of reckless brutality (if I may say so) exercised towards a dumb beast. If it was the latter, however much it might be censured, yet, in considering the case of this prisoner, it would have no bearing upon the question of malice in the commission of the crime with which he is charged. No matter what his previous conduct may have been in regard to this animal, or in regard to other matters, if you should find it was merely the result of a want of appreciation of the proprieties of life, or that the acts were acts of recklessness or brutality, then the prisoner upon this trial should not be prejudiced by them. So in regard to the mustard cup. If you should find that he threw it against the wall merely in a spirit of drunken recklessness, and that it did not indicate any feeling of personal hostility to the deceased, it would be an unimportant fact. So in regard to the sticking of the dagger in the counter. If you should come to the conclusion, on looking at all the testimony, that the remark that it will be the cause of the death of some one soon, had no application to the deceased, or had no reference to the crime which has since been committed, it should disappear from

Friery *v.* The People.

the case, and be treated as unworthy of consideration. On the other hand, if you should believe that all these acts were acts growing out of personal hostility—if you should find that they were acts indicative of his state of mind toward the deceased, they would bear very materially on the question of malice, or the intent to commit the offense with which he is charged. So these may be or may not be important." * * * *

"Now, in regard to intoxication, I shall not attempt to lay down any new law or state any views of my own, because it is settled in this State, as it is in Pennsylvania. I shall content myself by reading you the law as stated by the courts. In the case of *The People* v. *Rogers*, (18 *N. Y. Rep.* 9,) it was said: 'We must lay out of view, as inapplicable, the case of a person who had become insensible from intoxication, and who was performing an act unaccompanied by volition.' It is not claimed in this case that the prisoner at the bar was a person who had become insensible from intoxication, and who was performing an act unaccompanied by volition; therefore you must look at the prisoner, not as a man in that state, but merely as one who was more or less under the influence of liquor. The degree of intoxication you may determine in your own mind, if you can. If you consider him as a man who was intoxicated, but yet sensible and able to do an act in accordance with his will, the law is very plain. The courts have laid down this rule. No rule is more familiar than that intoxication is never an excuse for crime. There is no judge who has been engaged in the administration of criminal law who has not had occasion to assert it. Even where intent is a necessary ingredient in the crime charged, so long as the offender is capable of conceiving a design, he will be presumed, in the absence of proof to the contrary, to have intended the natural consequences of his own act. Thus if a man, without provocation, shoot another, or cleave him down with an axe, no degree of in-

toxication, short of that which shows that he was at the time utterly incapable of acting from motive, will shield him from conviction. In this case the defendant had struck the blow which caused the death, and to this act the law, without further proof, would impute guilty design. If the perpetrator would escape the consequences of the act thus committed, it was incumbent on him to show either that he was incapable of entertaining such a purpose, or that the act was committed under provocation. The adjudications upon the question, both in England and this country, are very numerous, and are characterized by a singular uniformity of language and doctrine. They all agree that, where the killing is unequivocal and unprovoked, the fact that it was committed while the perpetrator was intoxicated, cannot be allowed to affect the legal character of the crime. There is nothing in our statute, gentlemen, which gives us reason to say that the legislature intended to be understood as altering the rule laid down by the court in the case of *The People* v. *Rogers;* nothing to lead us to believe that the legislature meant to say that, because a man was intoxicated when he designedly took the life of another, his crime was to be reduced to murder in the second degree. In the recent case in Pennsylvania the same doctrine is substantially laid down, where the court says : 'No one pretends that intoxication is of itself an excuse or palliation of a crime. If it were, all crimes would, in a great measure, depend for their criminality on the pleasure of their perpetrators, since they may pass into that state when they will. But it is argued that, because intoxication produces a state of mind that is easily excited by provocation, therefore the crimes committed under the influence of such intoxication and provocation are less criminal than when committed in a state of sobriety under the same provocation. We are very sure that no statute will ever announce such a rule, and we are not authorized to announce it in interpreting the statute.'

The courts allow evidence of intoxication to be given to the jury, and the reason is very well stated by the court in the case of *The People* v. *Rogers,* and has been very well stated by the counsel here to-day. It is proper for the consideration of the jury in several aspects : First, as bearing upon the question of intent. A man may be so drunk as to be incapable of forming any intent. That may be the case. What would be the law in such a case is unnecessary to discuss any further than I have done. Evidence in regard to intoxication is admitted, for the purpose of giving the jury an opportunity to say how much weight is to be attached to expressions made immediately before and after the occurrence. The evidence of this man's intoxication is material, in determining what weight or importance is to be attached to the act of sticking the knife into the counter and the declaration accompanying it, or the expression used in the sleigh, ' The man is dead any how,' or to the expression used by him, ' I will dance at the wake.' Such expressions would have more force with the jury if made by a sober than by an intoxicated man. Courts allow such evidence to come in and to be considered by a jury ; but although they allow it to be considered, they declare intoxication is no excuse for crime, unless it exists in the degree before mentioned. Now, gentlemen, among the various propositions which have been submitted by the counsel for the prisoner, I find one or more to this effect—' That to convict the prisoner of murder in the first degree, it is necessary for the prosecution to show affirmatively, beyond reasonable doubt, that the prisoner had an intent to kill the deceased.' Of course that is so, and I have so charged. It must be shown beyond a reasonable doubt that he intended to kill, but if the intention exists a moment before the blow is struck, as I have already told you, it is enough. The other proposition, ' that the prosecution must affirmatively prove that the prisoner's mind was in a condition to form the intent,' is

involved in the general propositions which I have submitted to you. The other propositions in regard to intoxication, and in regard to the purpose for which evidence of intoxication is allowed to go to the jury, also in regard to the presumptions of law, and the general proposition that the prisoner is entitled to every reasonable doubt, I have already charged."

The jury found a verdict of guilty of murder in the first degree.

The prisoner's counsel asked the court to charge certain propositions. They were charged in a modified form. The charge of the court, arising out of the evidence as to occurrences on the morning previous to the murder, was on the question of malice, claimed to be calculated to mislead the jury as to the intent of the prisoner. It was insisted the charge was erroneous, so far as it laid down the law to be that the presumption was that Friery intended to kill Lazarus, whereas the jury should have been told that, under the gross intoxication Friery was in at the time, they should determine whether the prisoner had the intent to murder or not. It was claimed that the case came within the provision of the statute (*Laws of N. Y.* 1858, *p.* 556, § 2,) which provides that on an appeal from the court of New York general sessions, the appellate court may order a new trial, if it shall be satisfied that the verdict against the prisoner was against the weight of evidence or against law, or that justice requires a new trial, whether any exception shall have been taken or not in the court below.

*John Sedgwick* and *John McKeon,* for the plaintiff in error. I. As to the summoning and organization of the jury. The challenge to the array should have been sustained by the court and the demurrer of the people overruled. The facts charged by the prisoner and admitted by the demurrer were substantially—(1.) That the sheriff or summoning officer was not indifferent, which is a good cause for chal-

lenge; and (2.) That the main provisions of the statute in relation to the summoning of jurors had been violated. The same question having been raised and argued before the court at the present term, (September, 1865,) in the case of *The People* v. *Ferris,* the court is referred to the points of the defendant's counsel in that case, on that subject. In addition the following authorities are referred to: *Regina* v. *O Connell,* (11 *Cl. & Fin.* 351 *to* 365; 2 *Wharton's Cr. Law,* §§ 295, 296.) The words of the statute are *imperative,* in fact *prohibitory,* not directory: "Unless the sheriff or other parties named in the statute appear to witness the drawing of jurors, and not otherwise, the drawing cannot be proceeded with." "Negative words in a statute will make it imperative. (*Dwarris on Statutes,* 715.) The word 'shall' is used in all the other sections, and is as imperative a word as could have been used. In determining whether a provision in a statute is directory or peremptory, the test is, Is the provision of the essence of the requirement or of the form or manner of it? (*Striker* v. *Kelly,* 7 *Hill,* 9. *Marchant* v. *Langworthy,* 6 *id.* 646. *Rex* v. *Loxdale,* 1 *Burr.* 447.) The paper claimed to be a record has none of the attributes of such a document. It is not "the proceedings of a court of justice." (*Burr. Law Dict. Verbum "Record."*) The argument of the prosecution that the prisoner must show that injury has been done to him, is not tenable. In O'Connell's challenge the words showing that the special jury list was made up "as aforesaid," for the purpose and with the intent of prejudicing the defendant on the trial, were omitted. (*O'Connell's case,* 9 *Jurist,* 27.) On a challenge for irregularity in the summoning of a jury the court say the question is not, had mischief been done, but whether, under such circumstances, it might have been done. (1 *Crawf. & Dix,* 125. 2 *M. & S.* 41.) The prisoner complains of the violation of an imperative rule in relation to the challenge, (*Joy on Juries,* 126,) and if that violation be sanctioned, in the language of

Lord Denman, jury trial becomes "a mockery, a delusion and a snare." (*Regina* v.. *O' Connell*, 11 *Cl. & Fin.* 351. *Cancemi* v. *People*, 18 *N. Y. Rep.* 129.) The cases cited by the district attorney do not sustain his position that the statute is merely directory. The cases cited are on peculiar statutes in our own country. His main dependence is on Irish *nisi prius* cases, tried and decided in Ireland, in the midst of political excitement, by judges, the creatures of the British government, ready to make a "record of bloody assizes," to be avoided, not followed, by judges of our State tribunals.

II. The challenge to the respective jurors should have been sustained. (1.) The juror Davis, challenged on the ground that he did not own real estate, and had not been taxed for personal estate, should have been set aside. Not sufficient freehold is a good cause of challenge. (*King* v. *Edmonds*, 4 *B. & Ald.* 492. 3 *R. S.* 4*th ed.* 695.) (2.) The juror Charles H. Hadden was improperly admitted as a juror. He had been challenged for principal cause, on the ground that he had formed an opinion that a crime had been committed. This challenge was overruled, and then he was challenged for favor. The court should have given to the triors the instructions requested. "The juror should stand indifferent as he stands unsworn." (3.) The juror Brewster was challenged for principal cause, that he had read something of the transaction, and had formed an opinion that a crime had been committed. The court should have rejected the juror. (4.) The juror Wood was challenged for principal cause, on the ground "that he had read of the transaction, and had formed an opinion as to it." If the party was the prisoner, he had formed an opinion. He presumed he was the guilty party, if he was the prisoner. The fact of his forming an opinion on the case was not destroyed by his saying that he had formed no opinion as to Bernard Friery being guilty or innocent of killing Harry Lazarus. The name amounted to nothing. The juror had his mind fixed against the prisoner.

Friery *v.* The People.

The evidence taken on the challenge for favor cannot be used in determining the challenge for principal cause. The juror, on being challenged for favor, admitted he had made up his mind that a crime had been committed; that he recollected the names of Friery and Lazarus, and that Friery was the name of the man charged with the killing; that he had a presumption that he was the party who did the deed; and that it would certainly require evidence to remove that presumption. He replied to the questions of the district attorney, that if the facts he read in the paper were true, he, Friery, was probably guilty, but he said that he had no impression that would bias his mind against the evidence he would hear as a juror. The court said that "the indifference of the juror was not a question to be solved by any rule of law, but by the common sense of the jurors." The question was one of fact, under the instructions of the court as to the law. The question as to his impartiality between the people and the prisoner is not to be a mere whim of jurors. (5.) The juror Hazen was improperly admitted as a juror. On being challenged for principal cause, he admitted that he had read of the matter, that he remembered the principal facts, and he believed them to be true; that he certainly believed that a crime had been committed, and that the crime referred to the facts concerning the murder of Lazarus. The challenge for favor being interposed, he admitted that he had an impression and an opinion that some one had committed murder or manslaughter. The court charged the triors that the instructions he gave in similar cases must be their guide. The court referred, undoubtedly, to its previous charge, in which he laid down the law that there was no absolute rule of law which he could give the triors for their guidance. (6.) The juror Eaton should have been rejected. He was challenged for principal cause; that he formed an opinion, but whether he expressed it or not he could not say. The

Friery *v.* The People.

opinion formed was, that a premeditated murder had been committed; he based his opinion on the facts as he had heard them. The juror said that his mind was made up as to the crime of murder, if premeditated murder had been committed, and had some impression,·he admitted, that Friery was the man who had committed the murder. (7.) The juror Carpenter should have been rejected on the challenge for principal cause, as he had formed an opinion as to the matter that a crime had been committed, although he did not make up his mind who did it. He admitted that he made the remark, that "whoever did it ought to be punished." The prisoner was compelled to challenge him peremptorily, and was compelled to exhaust his challenges before the jury was complete. (8.) The juror Hicks should have been rejected. He was challenged for principal cause, that he formed the opinion that a crime had been committed, and this opinion was formed on reading and talking of the matter. (9.) The juror Newton should have been rejected. On being challenged for principal cause, he stated that he formed an opinion from reading about the matter in the *Herald*, that a crime had been committed. Before this juror was sworn the prisoner had exhausted all his peremptory challenges. (10.) The ten jurors who were peremptorily challenged should have been set aside under the several challenges for principal cause or for favor, and the prisoner should not have been compelled to have recourse to his peremptory challenge.

III. Rulings of the court as to evidence. (*a*) The evidence in relation to the transactions previous to the day of the homicide was improperly admitted. The occurrences testified to on days previous to the homicide tended to show that the prisoner was a brutal-minded man, and thus, in fact, having all the effect of proof of bad character of the prisoner. All the evidence did not show that the dog attacked by the prisoner belonged to the de-

ceased, and that the prisoner knew that the dog belonged to the deceased. The court seemed to be of opinion that these transactions might be acts growing out of personal hostility, indicative of a state of mind towards the deceased, and might materially affect the question of malice or intent to commit the offense with which he was charged. How these acts, committed at a different time from the homicide, could be pertinent to the issue, it is difficult to understand. (*b*) The question whether a part of the custom of Lazarus' house came from women, was improperly rejected. The object of it was to show that the place where the witness was the bar-keeper was the resort of prostitutes, and thereby submit the question of credibility of the witness to the jury. (*c*) The question as to what, if any thing, was said between California Jack, Clark, McDonald and Friery, in F.'s bar-room, should have been allowed. The district attorney claimed that the parties named were confederates. The object of the prisoner's question was to show that they were not confederates, and that so far from having arranged any attack on Lazarus in Friery's bar-room, they went for an innocent purpose into Lazarus' place, viz., to get cigars. As the stabbing was apparently without motive, and occurred immediately after leaving Friery's house, the fact sought to be proved would have affected the charge of malice, so far as murder was concerned.

IV. Charge of the court. (*a*) The charge of the court, founded on the evidence given of transactions previous to the murder, was calculated to mislead the jury on the intent of the prisoner—on the malice necessary for the crime of murder. (*b*) The charge that the law presumed from the facts that Friery intended to kill Lazarus. It had been conclusively proved that Friery was beastly drunk, and under that state of facts the court should have told the jury that from the facts they should determine whether the prisoner had the intent to murder or not.

Friery *v.* The People.

*A. Oakey Hall,* (district attorney,) for the people. The district attorney proposes to argue in support of this conviction, substantially, the following general propositions, to which the alleged errors attach:

1. The court properly refused, upon the challenge presented, to quash the array, or rather, to be more precise, the certificate of proper drawing and summoning.

2. The questions which concern the jurors who were peremptorily challenged after those questions arose, cannot be reviewed.

3. The jurors who were sworn under exceptions from the prisoner were legally competent jurors.

4. The evidence objected to was properly received.

5. The recorder's charge is unexceptionable

6. The substantial justice of the whole case cannot be reviewed, but only errors of law.

I. The challenge to the array was insufficiently and improperly presented, and the demurrer was well taken, and the challenge properly overruled. (1.) What was it that the challenge attacked? Because, like as in demurring to an answer, the complaint must be inspected, so in estimating the sufficiency in law, of a demurrer to a challenge, that which the challenge attacks must be first inspected. A panel was duly certified and duly filed in open court before the challenge was presented. (2.) The panel filed imported verity upon its face, and stated full compliance with the requirements of the statute. (2 *R. S.* 431, *Edm. ed., marg. paging* 414, § 29; *No.* 8, *and* § 30.) (*a*) "A list of the names of the persons so drawn, with their additions and places of residence, and specifying for what court they were drawn, shall be made and certified by the clerk and attending officers, and shall be delivered to the sheriff of the county. The sheriff shall summon the persons named, &c. He shall return the said list to the court at the opening thereof, specifying those who were summoned, and the manner in which each person was

notified." (*b*) This panel so certified into court was, in short, "a written memorial, made by a public officer authorized by law to perform that function, and intended to serve as evidence of something written, said or done." (*Bouv. Law Dic. Verbo "Record."*) (3.) The challenge, therefore, substantially attacked the verity of a record. It went no further than to deny the facts of the certificate. Will the court note the peculiarity of this challenge? It does not challenge, as is usual, the jurors now arrayed, (*see Verbo "Array," in Jacob's Law Dict., fol.* 23;) but it "challenges the array of the jurors upon the panel or list of jurors this day filed." It is a challenge against the list. (*a*) The challenge alleged omissions and irregularities in a general way only. It did not charge false certifying, nor collusion, nor forgery, nor fraud. (*b*) Says Joy, on *Challenges*, § 1: "Nor can the array be challenged for a cause which contradicts the record. This would be a direct averment against the record, as the array is returned by the sheriff, and the return is accepted." (*c*) The certificate of the officers who draw and summon the juries is conclusive against this mode of attack. "The certificate of the officer selecting a grand jury is a record, and cannot be impeached by showing that it was not signed by the clerk whose name appears to it, and that he was not present when the duties were performed. Such certificate is the proper evidence of the manner in which the jurors were returned." (*State* v. *Clarkson,* 3 *Ala. Rep.* 378; *Reaffirmed in* 9 *Ala. N. S.* 8–17. *O'Connell's Nisi Prius case,* 1 *Cox's Cr. Cases,* 395, 396.) (*d*) Suppose that the certificate was not filed in the court, but was elsewhere, and there was issue on the challenge; then the certificate would have been read in evidence; would the court permit it to be attacked orally? "Oral evidence is not admissible to impugn the certificate of the officers selecting grand jurors as required by law." (*State* v. *Allen,* 1 *Ala. Rep.* 442. (4.) The challenge contained two grounds:

1st. Interest of summoning officer. 2d. Non-compliance with the directions of the statutes in preparing the panel. (*a*) Ground number one is disposed of in favor of the people by the statutes. (2 *R. S.* 759, *Edm. ed.* § 10, *or marg. paging* 734, *in connection with id.* 437 *and* 420, *marg.*, §§ 56, 57. *Revisors' Notes in* 5 *id.* 473.) (*b*) Ground number two is not the subject of challenge to the array. Well stated in C. B. Sedgwick's brief in *Reed's case*, (2 *Blatch. C. C.* 443,) in which case there was a strife between counsel opposing, whether the action was a motion to quash, or whether it amounted to a challenge. One counsel seeking the motion, because unwilling to encounter this law of challenge which we invoke; the people's counsel, for the same reason, desiring to invoke it. (*c*) The only grounds are unindifferency, partiality, or a default amounting to misconduct, in the drawing or summoning officers. (*Joy on Challenge*, § 1.) (*d*) The note to *Pringle* v. *Huse* (1 *Cowen*, 432) contains the whole common law as to challenge to the array. (*Per Judge Nelson, in Reed's case*, 2 *Blatch. C. C.* 446.) And clearly this challenge, attentively read, is not within any known instance. (*e*) "It is no ground of challenge to the array if the sheriff in the main pursue the Pennsylvania act respecting the jury, without fraud." (*Comm.* v. *Lippard*, 6 *Serg. & Rawle*, 395.) (5.) "The statutes for selecting jurors, drawing and summoning them, form no part of a system to procure an *impartial* jury to parties. They establish a mode of distributing jury duties among persons in the respective counties, subject to that kind of service, and of setting apart those of supposed higher qualifications for the most important branch of that service; they provide for rotation in jury service; they prescribe the qualification of jurors; and the time and manner of summoning them, and are directory to those whose duty it is to select, draw and summon persons for jurors. By this means the court is supplied with jurors to aid in the administration

of the laws. Every person subject to that kind of duty is called out, in turn, to perform it, and those called on have timely notice. So that they may arrange to perform a public duty at the least inconvenience to their private affairs." (*Rafe's case*, 20 *Ga. Rep.* 60.) (*a*) In *Queen* v. *Conrahy*, the counsel for the crown argued respecting a challenge to the array, that "if such a plea as this were held good, if, where so many preliminary steps are directed by the act to be done by so many different persons, the slightest irregularity in any one of them, the slightest mistake on the part of any one of the constables, collectors, justices, clerk of the peace, sheriff or sheriff's officers, is to be deemed sufficient to vitiate the whole panel, the most mischievous consequences would follow, justice would be constantly defeated, &c. It is perfectly clear, however, that the enactments relied on in the challenge are only directory." He was interrupted by the court, (1 *Craw. & Dix's Irish Rep.* 62,) who said: "Questions similar to those raised in this case were discussed and decided at the assizes for Kerry. It was there held, and rightly as I conceive, that the enactments in question were directory only—the officers appointed to carry them into effect being punishable in case of neglect or misconduct." After counsel for defense had answered, the court sustained demurrer to the validity of the challenge, saying: "I have not the slightest doubt that this is not a valid challenge to the array; the statute (3 *and* 4 *Will.* IV. *ch.* 91) contains numerous enactments with reference to the mode of returning the names of persons qualified and liable to serve as jurors in Ireland, and if those enactments were to be held other than directory—if the non-observance of any one of the many directions therein contained were to be deemed sufficient to vitiate the whole panel, the consequence would be that the whole fabric of justice would fall to the ground. But I am of opinion that the enactments contained in the fourth, fifth, sixth, seventh,

eighth and ninth sections of the statute are merely direct-
ory, and the non-observance of the directions thereof is
not ground of challenge to the array, although such non-
observance may be punished by visiting the officer neg-
lecting or violating his duty, with the penalty imposed in
that behalf by the statute."   (6.) If it be said that the
words "and not otherwise" are mandatory in the section
about attendances of officers—and this being answered by
the reliance upon the certificate stating that the officers
*did* attend—yet the subsequent provisions are clearly
affirmative and merely directory.   (*a*) How liberally in
criminal cases our own courts have construed a statute as
directory, appears from *Dawson's case*, (25 *N. Y. Rep.* 405,)
where the court held that an indictment not filed was
valid, saying: "There being no words in the statute indi-
cating an intention on the part of the legislature that the
indictment should be void if not so filed, this provision
must be regarded as merely directory," and citing author-
ities.   And also in *People* v. *Cyphers*, and *People* v. *Kenny*,
(*MS. opinions of Court of Appeals.*)   (*b*) Objections to the
array, because the selection of the jurors varied in unes-
sential particulars from the laws, will not be heard.
(*Forsythe* v. *State*, 6 *Ham.* 19.)   (*c*) All that can be said
by our adversary is, that the (*ex gratia* admitted) irregu-
larities actually brought into court the same jurors who
would have come had every jot and tittle of the direction
as to drawing been fulfilled.   (*d*) Statutes directing the
mode of proceeding by public officers have always been
treated as advisory, and not intended to invalidate the
vitality of the proceedings themselves, unless expressly so
declared.   (8 *Verm. Rep.* 276, 280.)   (*e*) Thus the omis-
sions, should the certificate be impugned, did not avoid
the drawing; nor has the defendant charged, nor offered
to show, injury to himself because of these omissions.

II. The provisions respecting property or assessment
qualifications of jurors (2 *R. S.* 428, § 3, *Edm. ed., marg.*

*paging* 412) are repealed in New York county, (*Davies'*
*Laws*, 941, § 1,) and therefore the objections on this score
to jurors are untenable.

III. The challenges for principal cause were properly
overruled by the court; and its charges to the triors
were clear, legal, and remarkably free from usurpation
of the province of the triors. (1.) The opinion formed
or expressed must be individual towards the culprit—
in England it must be in the nature of express mal-
ice; but here the implied malice has been held to be
sufficient. But in no case does it appear that the fight was
made in behalf of the legal logic of the English doctrine.
(2.) Reference to these charges shows their legal accuracy.
*Freeman's case* (4 *Denio*, 31) effectually disposes of all ques-
tions antecedent to peremptory challenge.

IV. The legal sincerity of counsel did not place any reli-
ance, apparently, upon any of the exceptions to evidence
excepting the evidence of the prisoner's declaration re-
garding the dog. We will therefore only argue this excep-
tion, and contend that the declarations were admissible.
(1.) The weight of this evidence was probably light com-
pared with the greater and more convincing evidence of
malice in the case to be found at fols. 153, 196, 197. (2.) The
recorder carefully guarded this weight in his charge to the
jury. (3.) It was a recent declaration of ill will toward
property of the deceased, made in the utterer's place of
business, at the scene of the homicide, very shortly before its
perpetration. (4.) In *Rector's case,* (19 *Wend.* 591,) it was
said: "In the prosecution of a crime so essentially the
creature of intent as murder, everything pertinent should
be submitted to the jury upon which they can infer an
*absence* of malice." Surely the converse—presence—is as
true. (5.) A man is in B.'s stable one week and maims
B.'s horse maliciously, and the next week maims and kills
B. himself, in that very stable. Is not the first maiming
competent and relevant as a fact upon which to argue

malice against the owner at that time ?    Surely it is an act of great malice to injure inanimate property; and worse to injure unoffending animate property of a foe.    (6.) In the case of *People* v. *Conkey, Court of Appeals,* (5 *Parker,* 32,) the court sanctioned the admission at *nisi prius,* under exception in a rape case, of evidence showing that after the offense, as well as about its contemplation, the prisoner " overturned the stove, threw meat out of the window, broke the glass, and committed certain trespasses upon the property of the complainant."    V. The recorder's charge to the jury upon intoxication as a defense, and upon the legal requisites of murder in the first degree, were consonant with the well recognized principles enunciated by the Court of Appeals and this court. (*Rogers' case,* 18 *N. Y. Rep.* 9.    *Jefferd's case, MS. opinions.*    *Walter's case,* 19 *Abb.* 212.    32 *N. Y. Rep.* 147.)

*By the Court,* SUTHERLAND, J. It appeared from the challenge to the array, that the statute regulating the drawing and summoning of jurors had been directly violated or grossly disregarded, and the very important question in this case is, did the court below err in sustaining the demurrer to the challenge, and in refusing to grant the array.

The same question was presented in *Ferris's case,* argued at the same term,(*a*) and though I have serious doubts upon the point, yet I have not been able to satisfy myself that I would be justified in dissenting from the views expressed by Justice Leonard in his opinion in that case.

The question is, with what purpose or intent were these statutory regulations for the drawing and summoning jurors made? Were they made for the benefit of the parties to trials by jury, and for the purpose of securing such parties (in civil and criminal proceedings) an impar-

(*a*) Reported in the Court of Appeals, 31 *How. Prac. Rep.* 140 ; 35 *N. Y. Rep.* 125.

tial array of jurors, from which the jury to try the issue might be taken; or were these statutory regulations made for the purpose of securing an impartial distribution among citizens of the onerous duty of performing jury service? If the former was the purpose or intent, then it is clear that the demurrer to the challenge to the array should have been overruled, and the array quashed; for then it was the prisoner's right to have the statutory regulations complied with, independent of any suggestion of fraud or of misconduct, other than a failure to observe the statutory regulations. If, however, the purpose of the regulations was merely to secure a fair and impartial distribution of the jury duty among the citizens at large, then, in the absence of any suggestion of fraud or of misconduct, other than the mere failure to observe the regulations, it appears to me that the public only can complain of the disregard of the regulations. I am inclined to adopt the latter view, though with a good deal of hesitation.

A more thorough examination of the history of the common law challenge to the array than I have been able to make, would probably throw much light on the question of the probable purpose of these statutory regulations.

I concur in Judge Leonard's opinion in the case of *Ferris*, with less hesitation, from the fact that the Court of Appeals will undoubtedly have to pass upon the question in that case or this, perhaps in both.

The other questions in this case appear to me to be free from difficulty.

The juror Davis was challenged on the ground that he did not own real estate, and had not been taxed for personal estate. The juror testified that he did not own any real estate; that he owned personal estate, but had never yet been taxed for it, though he expected to be during the

Friery *v.* The People.

year. The challenge was overruled, and the juror was sworn as a juror.

The property or assessment qualifications of jurors, prescribed by the Revised Statutes, appear to have been repealed as to the city of New York, by the act of December 15th, 1847. (*Davies' Laws,* 941.) It would seem, then, that the challenge was properly overruled.

Several jurors were challenged for principal cause first, and then for favor, upon the ground that they had formed or expressed an opinion, and upon the triors finding against the challenges, were then challenged peremptorily by the prisoner. The case of *Freeman* v. *The People* (4 *Denio*, 31) is a sufficient authority for holding that the questions raised previous to the peremptory challenges of these jurors are not open for examination at the instance of the prisoner.

Other jurors (Hadden, Brewster, Wood, Hazen and others) were challenged first, but for principal cause, on the ground that they had formed or expressed an opinion, and upon these challenges being overruled, were then challenged for favor, and upon the triors finding against the challenges, were then sworn as jurors.

I think the case of *Freeman* v. *The People* (*supra*) is an authority for holding that, as to these jurors, no error was committed, either in overruling the challenge for principal cause, or in the charge of the recorder to the triors. He appears, fairly and properly, to have left the question of bias or indifference, between the people and the prisoner, to the triors.

I think the evidence as to the acts and declarations of the prisoner previous to the homicide, as to the sick dog, two-edged dagger knife, mustard cup, &c., were clearly admissible, as having a bearing on the question of malice or intent.

I can find no error in the charge of the recorder to the jury.

What he said to the jury as to intoxication as a defense, was in accordance with what I understand to be well settled principles of law.

Upon the whole, I think the conviction should be in all respects affirmed.

[NEW YORK GENERAL TERM, September 18, 1865. *Ingraham, Sutherland* and *Peckham,* Justices.]