WILLIAM PIERSON, PLAINTIFF IN ERROR, *v.* THE PEOPLE OF THE STATE OF NEW YORK, DEFENDANTS IN ERROR.

*Summoning of additional jurors — irregularity in, may be waived by the prisoner — Information acquired by a physician while attending a patient — when he is not prevented from testifying in respect thereto — Motive to commit a crime — what evidence competent to establish it.*

Upon the trial of the plaintiff in error for murder, the court having ordered additional jurors to be summoned, the clerk brought into court the box containing the names of the trial jurors for the county, and the box containing the names of those for the town, but not the one containing the names of those who had already served. The jurors having been duly summoned, the prisoner's counsel interposed a challenge to the array, on the ground that all the boxes were not brought into court as required by section 1059 of the Code of Civil Procedure. The court having sustained the challenge the prisoner's counsel withdrew it.

*Held,* that by withdrawing the challenge the prisoner waived any informality in the drawing of the jury, and was concluded from objecting thereto on appeal.

*Semble,* that as it did not appear that the names in the county jurors box were exhausted, the failure of the clerk to bring into court the third box did not affect the validity of the drawing.

The plaintiff in error was indicted, with one Rosetta Withey, for poisoning the husband of the latter. Upon the trial, a physician who had attended the husband, in his professional capacity after the poisoning, was questioned by the counsel for the People as to the symptoms of the deceased, and as to what he had learned concerning his condition while attending him. The counsel for the prisoner objected, on the ground that the witness could not testify as to information obtained by him while attending the deceased professionally.

*Held,* that the objection was properly overruled.

On a trial for a felony, evidence tending to prove the existence of a motive for its commission is not inadmissible because it may incidentally show the accused to have been guilty of a separate and distinct felony, or because such evidence relates to acts of the party accused, done subsequent to the felony.

WRIT OF ERROR to the court of Oyer and Terminer of Livingston county, to review the conviction of the plaintiff in error of murder in the first degree.

*James Wood,* for the plaintiff in error.

*D. W. Noyes,* district attorney, for the defendants in error.

TALCOTT, P. J.:

The return to the writ of error, in this case, brings up the record of the conviction of the plaintiff in error for the crime of

murder in the first degree, by and before the court of Oyer and Terminer, of Livingston county, over which the Hon. Charles C. Dwight presided.

The murder was alleged to have been committed on the body of Leman Bradley Withey by the administration of arsenic. Rosetta Withey, the wife of the said Leman Bradley Withey, was jointly indicted with Pierson. Pierson demanded a separate trial on the indictment, and he was separately tried. A bill of exceptions taken on such trial, duly settled and signed, is returned as a part of the record, whereby, amongst other things, it appears that the counsel for the said Pierson interposed a challenge to the array of jurors who were summoned to try said cause. The substance of which said challenge is, that after the commencement of the said term of Oyer and Terminer, the court made an order requiring the clerk of the county to draw "from the county box," and sheriff to notify thirty-six in number, of trial jurors, to attend the said term on the 25th day of February, 1878. That, thereupon, the clerk brought into court, from the clerk's office, the said county box in which the names of the trial jurors for the county were deposited. That there was present in court, at the same time, the box in which was deposited duplicate ballots containing the names of all persons mentioned and returned as trial jurors, who resided in the town of Geneseo, in which town the said term of the court was being held. But the said county clerk did not bring in the third box, required by law to be kept by him, and to be presented at such drawing. That the said clerk, in the presence and by the direction of the court, drew from the said county box, brought in by him, the names of thirty-six in number of trial jurors, and made two lists thereof, one of which was filed in his office, and the other delivered to the sheriff, who notified the persons so drawn to attend on the 23rd day of February. That, afterwards, on the 23rd day of February, the court made another order to draw fourteen in number of trial jurors, in addition to the said thirty-six first drawn, also from the said county box, and the same form was gone through as in the original drawing of the thirty-six additional jurors, and the fourteen were ordered to be drawn and summoned to attend on the 25th day of February, and the same were in like manner drawn and summoned.

The third box was not brought into court by the said county clerk at either of the said drawings, and the challenge avers that the said "clerk did not have in his possession, or keep the third box required by law in which to deposit the names of jurors who had served at the various courts held in and for the county of Livingston, at previous terms, in accordance with the provisions of the statute in such case made and provided."

The district attorney answered to the said challenge that the said additional jurors were in all respects duly and legally drawn, and prayed that the array of the said panel might be allowed by the said court.

And, thereupon, it was proved on the part of the said Pierson, in substance, that there were only two boxes for jurors kept in the county clerk's office; one containing the names of the trial jurors, made up from the list returned by the supervisors, town clerks and assessors of the several towns of Livingston county, and the other containing the names of trial jurors, selected from the town of Geneseo; and that there was no box in the county clerk's office in which to place the names of the trial jurors who had served at previous terms; that only the two boxes first named were produced in court at the time of the drawing of the said additional jurors; that the list of names contained in the county box, from which the said additional jurors were directed to be drawn, and which was brought into court, was made up in 1875; and that a new drawing was to take place, according to law, in July, 1878; and that the names of jurors who had served at previous terms, since the lists were made out and certified in 1875, were not presented in any box and could not be produced in any court. Thereupon, the said Court of Oyer and Terminer sustained the said challenge to the said array. And thereupon the prisoner's counsel withdrew the said challenge.

Chapter 16 of the Laws of 1871, providing for the drawing of additional jurors in any Circuit Court or Court of Oyer and Terminer, seems to have been repealed by section 1, subdivision 45 of chapter 417 of the Laws of 1877, known as the repealing act. The provisions of law, therefore, which governed the drawing of additional jurors, when the indictment in this case was tried, were sections 1050, 1058 and 1059 of the Code of Civil Procedure.

By section 1059 it is prescribed that, in drawing additional jurors, the clerk shall bring into court all the boxes wherein ballots containing the names of trial jurors are deposited, and must, in the presence of the court, publicly draw from such box or boxes, as the court directs, the number of trial jurors specified in the order. The irregularity insisted on by the challenge was, that there was no box present containing the name of those trial jurors who had attended and served at previous terms.

It is only when the first box is exhausted, that the second box can be resorted to under section 1051. It does not appear in the case that the first box was exhausted, nor, but what the regular panel furnished a sufficient number of names, which composed the jury before which the indictment was tried; and we apprehend that the challenge was sustained by the Oyer and Terminer from abundant caution, and not from any idea that any material irregularity in the drawing of the additional jurors had occurred, which could have resulted in any injury to the defendant.

It was held in *Friery* v. *The People* (54 Barb., 319) that the statutory regulations in respect to the drawing and summoning of jurors were not made for the benefit of parties to trials by jury, and for the purpose of securing to such parties (in civil and criminal proceedings) an impartial array of jurors, but were made for the purpose of securing an impartial distribution among citizens of the onerous duty of performing jury service, and that, hence, in the absence of fraud or misconduct, other than a failure to observe the regulations, the *public only* can complain that the regulations have been disregarded, and that "a challenge to the array by a prisoner on trial will not lie for a disregard of the directions of the statute."

This case was affirmed in 2 Keyes, 424, in which the Court of Appeals held that "any irregularity attending the drawing of jurors, which does not change the persons who are to compose the jury, does not tend to affect the rights of the prisoner, and will not be a good cause of challenge to the array."

The case of *Friery* was a conviction for murder.

In the case of *The People* v. *Rawson* (7 Wend., 417), it was held that the provisions of the statute are merely directory, and a neglect of its provisions is not, *per se*, sufficient for setting

aside the verdict. In *Ferris* v. *The People* (35 N. Y., 125), the same doctrine was reiterated in the case of a conviction for murder in the first degree, and also by the General Term of the third department in *Gardiner* v. *The People* (6 Parker's Crim. Rep., 157).

But, if there were material irregularity in the drawing of the jury, we think it was waived by the withdrawal of the challenge after the ruling of the court by which it was sustained.

It is provided by statute (2 R. S. Pt., 4, chap. 2, title 4, art. 2, § 52) that "no indictment shall be deemed invalid, nor shall the trial, judgment, or other proceedings thereon be affected * * * by reason of any other defect or imperfection in matters of form, which shall not tend to the prejudice of the defendant."

The prisoner may waive any matter of form or substance, only such as may relate to the jurisdiction of the court.

He may waive triers on the question of the indifferency of a juror, and agree that the court may act as a trier. He may waive the plea of *autre fois acquit*. In fact he may plead guilty to the charge in the indictment. (*Gardiner* v. *The People*, 6 Parker Cr. R., 194; *The People* v. *Mather*, 4 Wend., 229; *People* v. *Murray*, 5 Hill, 468; *Germond* v. *People*, 1 id., 343; *U. S.* v. *Rathbone*, 2 Paine's C. C. R., 578.)

In *Cancemi* v. *The People* (18 N. Y., 128, 137) the following language is used with respect to waivers and consents in criminal cases : " Effect may justly and safely be given to such consent in many particulars, and the law does, in respect to various matters, regard and act upon it as valid. Objections to jurors may be waived. The court may be substituted for triers to dispose of challenges to jurors. Secondary, instead of primary evidence, may be received ; admissions of facts are allowed ; and, in similar particulars, as well as in relation to mere formal proceedings generally, consent will render valid what, without it, would be erroneous. A plea of guilty to any indictment, whatever may be the grade of the crime, will be received and acted upon, if it is made clearly to appear that the nature and effect of it was understood by the accused. * * * But when issue is joined upon an indictment, the trial must be by the tribunal, and in the mode which the constitution and laws provide, without any essential change."

In the *Cancemi Case* the decision awarding a new trial was put clearly on jurisdictional grounds. The court had no power to pronounce sentence of death upon Cancemi, except upon his plea of guilty, or upon the verdict of a common law jury; and a jury of twelve men had not found him guilty.

So a challenge to the array may be waived by a challenge at the polls in a capital case. (*People* v. *McKay*, 18 Johns., 212.) We, therefore, think that by the withdrawal of the challenge to the array the prisoner waived all benefit thereof and expressed himself content with the jury as constituted, and cannot now raise any question as to the regularity of the drawing of the additional jurors, even if they had composed any portion of the panel by which he was tried, which, however, does not appear.

During the progress of the trial William H. Coe, a physician, was sworn as a witness on the part of the People. It appeared that he was duly authorized to practice physic, and that he had been requested to, and did, attend the deceased in his professional capacity. On the witness being inquired of by the district attorney concerning the various symptoms exhibited by the deceased, and what the witness had learned concerning the condition of the patient during the time of his attendance upon the deceased as such physician, the counsel for the prisoner objected to the evidence, on the ground that the information which the witness obtained, was obtained as a physician. That he (the witness) had no right to disclose it, and that the evidence offered was prohibited by the statute. The objection intended to be raised by the counsel for the prisoner is founded on section 834 of the Code of Civil Procedure, and is as follows: "A person duly authorized to practice physic or surgery shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity."

In considering the question thus presented it will be assumed that the information, sought by the examination of the witness, was information acquired while attending the patient in a professional capacity, and that it was necessary to enable the witness to act in that capacity.

By section 836 it is provided that the last preceding three

sections, which provide against the disclosure by clergymen, physicians, and attorneys and counselors, shall apply to every examination of a person as a witness, " unless the provisions thereof are expressly waived by the person confessing, the patient or the client."

Section 834 of the Code is substantially a re-enactment of a similar provision in the Revised Statutes, and which was by the enactment of the Revised Statutes for the first time made a part of the positive law of this State. The reason of this enactment was in order that the fullest confidence might exist between the patient and' his medical adviser. The revisers, in their note to this section in which this provision is contained, say : " The ground on which communication to counsel are privileged, is the supposed necessity of a full knowledge of the facts to advise correctly, and to prepare for the proper defence or prosecution of a suit, but surely the necessity of consulting a medical adviser, when life itself may be in jeopardy, is still stronger, and unless such consultations are privileged men will be incidentally punished, by being obliged to suffer the consequences of injuries without relief from the medical aid, and without conviction of any offence. * * * It is believed that the proposition in the section is so guarded that it cannot be abused by applying it to cases not intended to be privileged." (Revisers notes to part III, chapter 7, title 3, section 73 of the Revised Statutes.)

Section 836 of the Code of Civil Procedure enacts only that the privilege created by section 834 is to apply to every examination of a person as a witness, unless the provisions of section 834 are expressly waived by the patient, which is in accordance with the opinion of C. J. SAVAGE, as expressed in the court of errors on the appeal from the decision of the chancellor in *Johnson* v. *Johnson* (14 Wend., 637).

The exceptions presented in this case shows how mistaken were the revisers of the statutes of 1830, in supposing that the section was so guarded that it could not be abused by applying it to cases not intended to be privileged. Here is a privilege designed exclusively for the benefit and protection of the patient which it is insisted, not without some colorable foundation in the language of the section in question, may be invoked to shield the

alleged murderer of the patient from a disclosure of facts which might have a tendency to establish the commission of the murder.

The statute which prohibits a physician from disclosing the information acquired by him, in attending a patient in his professional capacity, has received judicial construction with infrequency, compared with the corresponding privilege in the case of counselors and attorneys, which having been established under the common law has, of course, had a much longer existence.

In the case of *Hewitt* v. *Prime* (21 Wend., 79), where the defendant, in an action for seduction, had applied to a practicing physician for drugs to produce an abortion upon a pregnant female, BRONSON, J., said, in regard to the admissibility of the evidence of the physician in behalf of the plaintiff, " the witness (the physician) I think was not privileged. It is very doubtful whether the communication, made to him by the defendant, can be considered as consulting him professionally within the meaning of the statute, and it is certain that the information given was not essential to enable him to prescribe for the patient, if the daughter of the plaintiff should be considered a patient, in respect to the transaction." In *Johnson* v. *Johnson* (4 Paige, 460) the chancellor held, in an action for divorce, that the testimony of the physician of the husband, in regard to some material facts, information of which was obtained by the physician while attending the husband professionally, was illegal and improper, and ought not to have been read. The objection in this case was not made by the husband, but the physician himself declined to answer. The chancellor regarded the statute as not merely *excusing*, but as expressly *prohibiting* a physician from disclosing such information as having been obtained within the statute, and that such disclosure would be in direct violation of the statute.

The case of *Johnson* v. *Johnson* was appealed to the court of errors, where the decision of the chancellor was *reversed* (and not affirmed, as is erroneously supposed by the counsel for the prisoner). In the court of errors Chief Justice SAVAGE, who delivered the only opinion which alludes to this subject, held that it was the privilege of the party and not of the witness, and like the privilege of an attorney in that respect might be waived by the party. The reversal of the decree of the chancellor can

scarcely be held to have been on the ground that he had erro-
neously construed the statute, for Chief Justice SAVAGE held that
the evidence *aliunde* that of the physician was sufficient to estab-
lish the facts.

In the case of *Allen* v. *The Public Adm'r*, where the probate
of a will was contested, on the ground of incapacity and undue
influence, a physician who attended the alleged testator, about the
time when the will was executed, was objected to, as being pro-
hibited by the statute, and it was held by Bradford, surrogate,
that where, from the death of the person professionally visited,
there is no one to claim the privilege, its assertion is of necessity
excluded, and that if, after the probate or administration, the per-
sonal representatives or devisees might claim the benefit of the
privilege in controversies with third persons, growing out of the
estate, yet, before any grant of administration in a proceeding, as
it were, *in rem*, to ascertain what is the will of the deceased, and
who are entitled to succeed to his estate, and to represent him,
there is no one, in fact, competent to assert such privilege, even
if it survived ; and that the admission of the testimony of the
physician was not the case of an attempted use of confidential
intercourse, adversely to the interest or rights of a party, or
those who take under him, or who, representing him, might
equitably be considered subrogated to his privilege. (See case
reported in 1 Bradford's Rep., 221), which case was affirmed
*sub nom.* (*Thayer* v. *Allen*, Selden's Notes, 57; April, 1853.)
Wharton, in his work on the Law of Evidence, speaking of the
privilege in respect to communications with an attorney, says at
section 591 : "The privilege, it should also be remembered, is
meant to protect the living in their business relations, and cannot
be invoked when the question arises as to the intention of a
deceased person in respect to the disposition of his estate."

As somewhat opposed to the proposition thus laid down by
Mr. Wharton, may be considered the case of *Edington* v. *The
Mutual Life Ins. Co.* (67 N. Y., 185), which was an action
brought by an assignee of sundry policies upon the life of William
F. Diffendorf, which had been procured for his own benefit, and
held by him up to the time of the assignment. In an action on
the policies, it was proposed to contradict the statements made by

the insured in his application for the insurance, by calling as witnesses certain physicians who had attended him in his lifetime, which testimony was excluded as contrary to the statute. It was held that the exclusion was proper, and that the right to exclude such evidence survived to the assignee of the policies. The reasons for the inadmissibility of the testimony being that "it is a just and useful enactment introduced to give protection to those who were in charge of physicians, from the secrets disclosed, to enable them properly to prescribe for the diseases of the patient. To open the door to the disclosure of secrets, revealed on the sick bed, or when consulting a physician, would destroy confidence between the physician and the patient, and it is easy to see might tend very much to prevent the advantages and benefits which flow from this confidential relationship." The opinion of the court also contains the further remark, that "the statute in question being remedial should receive a liberal interpretation, and not be restricted by any technical rule."

A similar question arose in *Dilleber* v. *The Home Life Ins. Co.* (69 N. Y., 256), in which an action was brought by a wife who had effected a policy upon the life of her husband, in which the court held the evidence had been improperly admitted, and reversed the judgment upon the authority of the previous case of Edington.

The reasons for the exclusion of evidence of this character are very fully stated by the court in the *People* v. *Ira Stout* (3 Parker's Crim. R., 670), which also lays down the proposition that, "in the case of such a statute, it is peculiarly the duty of the court to look for its spirit, and be guided thereby in its application." It is one of the fundamental rules for the construction of statutes that it is the duty of the courts to construe statutes according to the intentions of the Legislature, "and whenever such intention can be discovered it ought to be followed with reason and discretion in the construction of the statute although such construction seem contrary to the letter of the statute; * * * and a thing which is within the letter of the statute is not within the statute, unless it be within the intention of the makers." (*People* v. *The Utica Ins. Co.*, 15 Johns., 358.)

"It is the duty of the courts so to construe statutes as to meet

the mischief, and to advance the remedy, and not to violate fundamental principles." (*Hunt* v. *Cleis*, 8 Johns., 41.) Statutes must be expounded according to the meaning, and not according to the letter. (*Pillow* v. *Bushnell*, 5 Barb., 156.)

In the *Bank of Utica* v. *Mersereau* (3 Barb. Ch., 528, 598), the chancellor said : "The seal of professional confidence has never been held to cover a communication, made to an attorney to obtain professional advice or assistance as to the commission of a felony, or other crime which was *malum in re*, and BRONSON, J., in *Coveney* v. *Tannahil* (1 Hill, 33) uttered a similar opinion, saying : "The privileged relation of attorney and client can only exist for lawful and honest purposes."

We think, therefore, that the purpose for which the aid of this statute is invoked in this case, is so entirely foreign to the purposes and objects of the act, and so diametrically opposed to any intention which the Legislature can be supposed to have in the enactment, so contrary to, and inconsistent with its spirit, which most clearly intended to protect the patient and not shield one who is charged with his murder ; that in such a case the statute is not to be so construed as to be used as a weapon of defence to the party so charged, instead of a protection to his victim.

In this case, it does not appear that there is any party now living who can claim to represent the deceased in relation to the subject-matter, unless it be the People as *parens patriæ*, so that, if necessary, the decision might probably be rested on the case of *Allen* v. *The Public Adm'r* (*supra*). But, without assuming any narrower ground, we think that the decision that the statute does not apply to the case may well be placed upon the broad claim that the case presented is not within the spirit and intent of the statute, although within the letter. It is not unworthy of remark that the view we take of the effect of the statute excluding the evidence of physicians, as to information obtained by them in the course of their professional employment, is in harmony with what we suppose to be the general understanding of the object and effect of the statute, as shown by a constant practice in capital trials, especially such as involve an examination of a charge of poisoning, of receiving testimony of this description, without which, the ends of justice would be, in many instances, frustrated,

and a statute, intended for a humane and benign purpose, be used as a protection and shield from the consequences of the deliberate perpetration of one of the highest crimes known to the law.

Another exception to the admission of testimony on the part of the People, and which is prominently pressed upon our attention, arose under the following circumstances. As it afterwards, and upon the cross-examination of Rosetta Withey, and the prisoner at the bar appeared, they both, soon after Withey's death, left Avon, the place where the homocide was alleged to have been committed, where they had resided, and by consent met at the railroad depot at Rochester, whence they proceeded to a hotel in Rochester where they passed the night, and thence proceeded together, with occasional stoppages, to Jackson, in the State of Michigan, the prisoner paying the traveling expenses of both parties. On the trial, Isaac Butterfield was produced as a witness on the part of the People, who, having stated that he resided in Jackson and was a Baptist clergyman, and saw the prisoner at the bar and the said Rosetta together at Jackson, in Michigan, on the 26th day of February, in the year 1877, was told by the district attorney. "You may state what took place between those parties and yourself at the time you met them in Michigan." This was objected to, generally, by the counsel for the defendant. The objection was overruled and the defendant's counsel excepted. The witness then proceeded to make a statement as follows: "Answer. The parties came to my room and wished to be married. I administered the oath to Pierson, as he was a stranger to me. The oath was, that he would correctly, according to his best knowledge and belief, answer the questions addressed to him relative to his eligibility to the matrimonial alliance he proposed. I then asked him if he knew any legal objection to his entering into this matrimonial alliance. He said he did not. I asked him his age, his residence, his birth place, his occupation, and the answers were taken down as I asked the questions. He gave his name as William B. Pierson, present residence, New York, born in New York, age 32, occupation, a farmer. I asked the name of the lady and she gave it as Rosetta Withey, born in New York, present residence in New York, age 37. I then married the parties according to the laws of the State.

In reply to the question whether he knew of any legal objection, he said, I do not. I performed the marriage ceremony according to the laws of the State of Michigan."

It had theretofore appeared that Pierson was married and had a wife and five children living with him at Avon, in the neighborhood of the place where the said Rosetta and her husband had resided, and that the situation of the said Pierson, in respect to his being already married and having the said children, was probably well known to the said Rosetta. The defendant's counsel objected to this evidence because, as he says, it "tended to prove that the defendant was guilty of perjury and bigamy." There was no motion made to strike out any portion of the statement made by the witness Butterfield, and no objection made to the statement in answer to the request of the district attorney, except a general objection. *Prima facie*, the request of the district attorney was entirely proper. It called for a statement of what took place between the witness and the parties. It was undoubtedly understood that the district attorney sought to prove the form of a marriage between the parties, and it is stated in the points of the counsel for the defendant, that the district attorney claimed the right to give the evidence, on the ground that it tended to prove a motive for the perpetration of the murder charged in the indictment, and that the motive imputed was, that the defendant had become possessed of an unlawful passion for Mrs. Withey, and that the murder was perpetrated to facilitate the gratification of his desires by the possession of Mrs. Withey's person. Evidence of slight familiarities between the defendant and Mrs. Withey had been previously given, but not sufficient to establish, of themselves, the fact of any criminal intercourse. We have no doubt but that the evidence was proper to reflect light upon the motive, under pressure of which the crime charged in the indictment may be supposed to have been committed, and if the witness, in giving an account of the circumstances attending the form of marriage which he performed in Michigan, incidentally gave evidence tending to show that the defendant committed the two other crimes mentioned, especially in the absence of any more specific objection, and when the attention of the court was not called to such parts of the statement of the clergyman as may

have been obnoxious to specific objection on the grounds stated, it was the misfortune of the defendant's case that the simple narration of his acts necessitated the proving of, at least, one of the other offences.

It is true that, on a trial for a felony, separate and distinct felonies cannot, generally, be proved for the purpose of establishing the fact directly that the prisoner committed the offence for which he is on trial, or for the purpose of raising any direct inference in the affirmative as to the principal issue, but such evidence is competent for the purpose of proving the existence of a motive to commit the crime in question, in case where there is some apparent connection or relation between the imputed motive and the felonies proposed to be proved. Therefore, on a trial for felony, it is not a valid objection to evidence otherwise competent, that it would tend to prove the prisoner guilty of a different felony. (*The People* v. *Stout*, 4 Parker's Crim. Rep., 71.)

It does not lie with the prisoner to object, that the fact proposed as a circumstance is so heinous in its nature and so prejudicial to his character that it shall not be used as evidence against him if it bears on the fact in issue. (Id., 115.) There was no precise evidence of cohabitation between the defendant and Mrs. Withey given anywhere in the case, but the fact that the defendant went through the form of a marriage ceremony with her was proper to be submitted to the jury, from which they might, judging by the ordinary conduct of human nature, have legitimately inferred a motive for the commission of the offence charged.

The counsel for the defendant requested the court to charge the jury, among other things, " that before the accused may be convicted, it must be proved that there was an adequate motive for the commission of this crime," to which the presiding justice said : " I cannot charge you that in terms, without explanation. What is an adequate motive ? There is no adequate motive, intelligently considered in the light of the moral law, of the Divine law, even of the human law, there is no adequate motive for such a crime. And yet there are motives which, though not adequate for the commission of such crimes, are yet sufficient to lead men to the commission of such crimes, and they do it every day. Was there such a motive, operating on the mind of the person to whom it

was suggested, sufficient to move him to the commission of the crime? I am requested to charge you that there is no evidence of the existence of such a motive prior to the death of Withey, whose death constitutes the *corpus delicti* of this crime. I cannot charge you that ; that is a question for your consideration, which I submit to you. His actions after that time may reflect light upon the question what motives existed in his mind before that time. If, after that time, you find him hastening to a realization of the unholy passion, which, it is suggested, constituted that motive, it will be a question for you to answer whether that fact establishes to your satisfaction the existence of the motive before that time, in connection with all the other circumstances of the case."

We see nothing in the remarks of the presiding justice, in reply to these requests to charge, that can give any countenance to the objection of the defendant's counsel, that by this charge the jury were instructed, or in any way authorized, to use the evidence of a *subsequently* existing motive, as evidence going to establish the fact that the alleged and antecedent crime was committed by the defendant, or that a motive only, brought into existence at a subsequent period, might be held by the jury to bear upon the question of fact, whether the prisoner was guilty of the antecedent offence. On the contrary, we think the charge was properly guarded against any misconception of that character, and was in every way proper and correct.

" Motive," said Judge JOHNSON, in *People* v. *Wood* (3 Parker's Crim. R., 681) " is a minor or an auxiliary fact, from which, when established in connection with other necessary facts, the main or primary fact of guilt may be inferred, and it may be established by circumstantial evidence, the same as any other fact." The charge was, in our opinion, entirely in accord with the principles thus laid down.

The remark made by the presiding justice in the course of the charge, by which he called the attention of the jury to the circumstance that Mrs. Withey, in giving to Dr. Nesbitt and to Calvert, in the presence of Withey, a statement of what Withey had eaten and drank just before he was taken with the symptoms exhibited by him, and which, according to the theory of the prosecution, were occasioned by arsenical poisoning, she had omitted to state

that Withey had drank a quantity of cider, and that as the statement had been made " in the presence of the deceased, and would undoubtedly have been corrected by him if a false statement had been made, was not, in our view, objectionable. It was merely calling attention to a fact which appeared by the evidence, and even if it can be considered as the expression of an opinion that the statement by Mrs. Withey, that the deceased had partaken freely of cider at about the same time that he ate mush and milk, was probably an afterthought, did not prejudice the prisoner, as the question of what credit should be given to the testimony of Mrs. Withey, on the subject, was expressly left to the jury. (*Jackson* v. *Packard*, 6 Wend., 415; *Durkee* v. *Marshall*, 7 id., 312; *Althorf* v. *Wolfe*, 22 N. Y., 355.)

There were sundry other requests by the defendant's counsel that the court should charge the jury in certain language, which were declined, the court refusing to charge on the subject referred to in any manner different from what the judge had already charged. We think these requests were all properly disposed of. We have examined the entire charge carefully, and we think it was as full on the subjects involved in the case as was called for, and free from any legal objection.

The case contained many elements calculated to strongly excite the prejudice of a jury and to interfere, to some extent, with that calm, deliberative and unimpassioned consideration of the evidence which is expected of a jury, to which the result of a capital case is committed, but we do not see that any legal error has been committed, and, therefore, feel bound to affirm the conviction.

SMITH and HARDIN, JJ., concurred.

The conviction and judgment of the Oyer and Terminer of Livingston county are affirmed, and the case and proceedings are remitted to that court, with directions to proceed and fix another day for the execution of the sentence.