BERNARD FRIERY, Plaintiff in Error,

*v.*

THE PEOPLE, Defendants in Error.

Any irregularity attending the drawing of jurors, which does not change the persons who are to compose the jury, does not tend to affect the rights of the prisoner, and will not be good cause of challenge to the array.

Where the prisoner challenges a juror for principal cause, and, his challenge being overruled, he then challenges him peremptorily, he thereby waives his challenge for principal cause.

*It seems* that a party seeking to reverse a judgment of the General Sessions of New York, convicting one of the crime of murder, should allege and prove a *prejudicial* error in the proceedings ultimating in such conviction.

### Writ of Error to the Supreme Court.

THE plaintiff in error was indicted in the Court of General Sessions of the Peace of the city and county of New York, for the murder of Henry Lazarus, in that city, on the 3d January, 1865. The trial took place in that court February 13th, 1865, before the Hon. JOHN T. HOFFMAN, Recorder. It appeared that at the close of 1864,

and at the beginning of 1865, Lazarus, the deceased, and Friery, the prisoner, kept adjoining drinking and rival lunch saloons in East Houston street. Between three and four o'clock, on the morning of the 3d of January, 1865, a sleigh drove up to Friery's place. Two men (Clark and McDonald) got out of the sleigh and went into the prisoner's place, the driver of the horses remaining in the sleigh. They stayed in there some five minutes. They then came out with Friery, and a person called California Jack, and went into the place of Lazarus, where were the deceased, his bar-keeper, and one other person. As they entered, California Jack said, " I'll bet $100 I have got a man here that will lick any man in the house." No one made any reply, when Jack turned round to Friery, and asked him, " What his weight was ?" Friery did not answer, when Jack said again " I'll bet ten ($10) dollars I have got a man here that will take that pistol from you Harry (meaning the deceased). Lazarus said " I'll bet you haven't, because I have no pistol," and he threw open both his coats and showed them that he had no pistol. The bar-keeper requested Clark and McDonald to have no disturbance there, and they promised him there should be none. Friery then stepped up to Lazarus, apparently to shake hands with him. Lazarus held his head down, and shook it and said, " I don't want to shake hands with you ; and said that he hoped that they did not come in to raise any disturbance." Friery then leaned back on the counter and said to him, " You are a dirty little loafer, a little coward." Whereupon Lazarus, who had a sore hand, wrapped in two handkerchiefs, took one of the handkerchiefs off and threw it over the bar, and said to Friery, " I'll fight you anyway, now." At this moment the bar-keeper turned round to get some cigars for the party, and as he turned he heard the prisoner use the expression " You are a good little man, Harry," and as he turned towards him again, he saw the prisoner draw a dirk knife, with a blade some seven inches long, out of the neck of Lazarus. Another

witness testified, that he saw the prisoner take the knife out, walk from the bar to the table near the stove, where Lazarus was, and plunge it into his neck. The prisoner and his party then turned and left the room, the prisoner remarking, " He is a good little man, but I guess I have fixed him." They passed out, got in the sleigh that was in waiting at the door, and drove around towards the Bowery, singing and frolicking. One of the men took the lines from the driver's hands, saying that he did not drive fast enough, and put the horses on a run. They went up town. In the course of the ride, some one of the party remarked " The son of a bitch is dead now." After they got up town, near Yorkville, the sleigh was discharged, and they went somewhere, but where was not shown.

When Lazarus was stabbed with the dagger, he staggered over against the table, and was caught by the bar-keeper, when about falling, laid upon the floor, and a policeman called. He died immediately from the effect of the wound.

The same day, about one o'clock in the afternoon, the prisoner, McDonald and Clark were joined by a policeman who had followed them in a street car, to a drinking saloon, on Third Avenue, between 117th and 118th streets. Some conversation occurred between the policeman and the prisoner. The prisoner asked him what he was doing there? The policeman said he wanted him, and asked him if he was not down at the shindig at Lazarus'? To which the reply was, " Never mind, take a drink." Then, in the course of the conversation, the question was asked whether Lazarus was dead? The policeman stated to him that he was, and asked him if he was implicated in the killing of him. He said " Yes, I have killed him, and I'll dance at his wake." He was taken into custody.

It was shown that for some days prior to the homicide the prisoner had been drinking liquor freely. About seven

o'clock, in the evening 2d of January (kept as New-Year's day), he having been engaged most of the day, with a comrade, in drinking at different places about the city, was lying on the table, in his own bar-room, asleep, in a state of beastly intoxication : Afterwards he went up stairs to bed, where he remained until about three o'clock in the morning, when he got up and came down to the bar-room. Shortly afterwards, McDonald and Clark came in, and after drinking, the party, including the prisoner and California Jack, left for the place of Lazarus. After the stabbing, the prisoner came out, got into the sleigh and told the driver to drive off. California Jack did not go with the party.

The morning before the killing, the prisoner was in Lazarus' saloon. He had a knife, Lazarus was not present. The bar-keeper was asked to state to the jury, how he had the knife and what kind of a knife it was. The prisoner's counsel objected to any evidence on the subject alluded to in the question, except that part calling for a description of the knife, as irrelevant. The court overruled the objection. The witness testified that it was a two edged dagger knife, blade seven or eight inches long, with a white handle. The prisoner held it in his right hand ; he struck it into the counter and left it there ; he was standing with his back to the bar ; he reached his hand back and drove it into the bar, and left it sticking there, and said "that will be the death of somebody around here before long" or "somebody here."

Some weeks or so before the killing, the prisoner was in Lazarus' place in the morning. Lazarus was not in. The bar-keeper was asked if he then did anything with anything belonging to Lazarus, and the witness answered yes. He was then asked what did he do, and what did he say ? The prisoner's counsel objected to the question as irrelevant and immaterial. The objection was overruled. The witness testified in substance, that when the prisoner came in that morning, there was a large New-

foundland dog (shown to have belonged to Lazarus) lying sick under the table. The prisoner came up to the bar and asked for a drink. Before he drank, he went over and took an ice pick out of his pocket and hit the dog with it three or four times in the head. Then he left him and took part of his drink, and commenced beating the dog again. Drumgold, a person present, coaxed him away. He went back, and commenced beating the dog a third time, and jammed the sharp end of the ice pick down the dog's mouth and broke out some of his teeth. While he was doing this he said, " I can make him sing." He was in at Lazarus' place at this time about ten minutes. This dog, the witness testified, belonged to Lazarus; it was kept about the premises and it was the only one of the kind there. Lazarus had had him all the time the bar-keeper was there, and the bar-keeper went with Lazarus a few days after the prisoner started his drinking place the next door.

On Monday, the 2d of January, about six o'clock in the evening, the prisoner came in to Lazarus' place, Lazarus was not in. A witness was asked to tell the jury, what, if anything, he saw Friery do, on this occasion?" The prisoner's counsel objected to the question as irrelevant.

The district attorney offered to prove that the prisoner took from a lunch table a mustard cup and flung it against the wall. The court overruled the objection. The witness answered, " The prisoner entered, stepped to a lunch table, helped himself; called for cigars, and again stepped to the lunch table, ate something; afterwards picked up the mustard cup from the table, threw it across the room, and left the house. On the three several occasions referred to the prisoner was more or less under the influence of liquor.

On the cross-examination of the bar-keeper of Lazarus, he was asked, " Did a part of the custom of that house come from women?" The district attorney objected to

the question as irrelevant and immaterial, and the court sustained the objection, and the prisoner excepted.

One Donahue, a witness for the defense, testified that he was at Friery's place just prior to the homicide. California Jack and McDonald were in the bar-room, Friery had a glass of liquor, and was leaning against the bar. The prisoner's counsel put the question to the witness, "Do you know what, if anything, was said between California Jack, Clark, McDonald and Friery in his (Friery's) bar-room?" The question was objected to, and the objection sustained, and exceptions taken.

The recorder, after charging the jury as to the legal requisites of murder in the first degree, and in respect to which no complaint is made, proceeded as follows :

"I have been asked to charge you, 'that the presumption of the law, that a man intends the natural and public consequences of his own acts is based upon the usual and ordinary condition of the mind of men, and should not be applied strictly to the case of a man whose mind is shown not to be in the usual and ordinary condition of the mind of man.' In regard to that, I shall charge you, as follows: A man who is in a state of voluntary intoxication is subject to the same rule of conduct, and the same legal inference as a sober man. * * * If a man is not so drunk as to be unable to judge of what would be the probable consequences of his act, he is judged by the same standard as a sober man. When the prisoner plunged the dagger into the neck of Henry Lazarus, the law presumed that he intended the natural consequences of that act, by the death of Lazarus, and that presumption he must abide the consequences of, unless you should say that he was so drunk as not to be able to judge of what the probable consequences of his acts would be. * * * Now, in regard to intoxication, I shall not attempt to lay down any new law or state any views of my own, but shall content myself by reading you the law as stated by the courts.

" In the case of *The People* v. *Rogers*, it was said : ' We must lay out of view, as inapplicable, the case of a person who had become insensible from intoxication, and who was performing an act unaccompanied by volition.' It is not claimed in this case, that the prisoner was a person who had become insensible from intoxication, and who was performing an act unaccompanied by volition : therefore, you must look at the prisoner not as a man in that state, but merely as one who was more or less under the influence of liquor.

"The decree of intoxication you may determine in your own mind, if you can ; if you consider him as a man who was intoxicated, but yet sensible and able to do an act in accordance with his will, the law is plain ; the courts have laid down the rule. No rule is more familiar than that intoxication is never an excuse for crime, even when intent is a necessary ingredient in the crime charged. So long as the offender is capable of conceiving a design, he will be presumed, in the absence of proof to the contrary, to have intended the natural consequences of his act. Thus, if a man without a provocation, shoot another or cleave him down with an axe, no decree of intoxication short of that which shows he was at the time utterly incapable of acting from motive, will shield him from conviction. In this case, the defendant had struck the blow which caused the death, and to this act the law, without further proof, would impute guilty design. If the perpetrator would escape the consequences of the act thus committed, it was incumbent on him to show, either that he was incapable of entertaining such a purpose, or that the act was committed under provocation. The adjudications upon the question, both in England and in this country, are very numerous, and are characterized by a singular uniformity of language and doctrine.

" They all agree that, when the killing is unequivocal and unprovoked, the fact that it was committed while the perpetrator was intoxicated, cannot be allowed to

affect the legal character of the crime.   *   *   The courts allow evidence of intoxication to be given to the jury, and the reason is very well stated by the court in the case of *The People* v. *Rogers.* It is very proper for the consideration of the jury in several aspects : First, as bearing upon the question of intent. A man may be so drunk as to be incapable of forming an intent. What would be the law in such a case is unnecessary to discuss further than I have done. Evidence in regard to intoxication is admitted for the purpose of giving the jury an opportunity to say how much weight is to be attached to expressions made immediately before and after the occurrence.

"The evidence of this man's intoxication is material in determining what weight or importance is to be attached to the act of sticking the knife into the counter, and the declaration accompanying it, or the expression used in the sleigh, ' the man is dead anyhow,' or to the expression used by him, ' I will dance at his wake.' Such expressions would have more force with the jury if made by a sober than by an intoxicated man. Courts allow such evidence to come in and be considered by a jury ; but though they allow it to be considered, they declare that intoxication is no excuse for crime, unless it exists in the degree before mentioned. Now, gentlemen, among the various propositions which have been submitted by the counsel for the prisoner, I find one or more to this effect, ' That to convict the prisoner of murder in the first degree it is necessary for the prosecution to show affirmatively beyond reasonable doubt that the prisoner had an intent to kill the deceased.' Of course, that is so, and I so charge. It must be shown beyond a reasonable doubt that he intended to kill, but if the intention exists a moment before the blow is struck, as I have already told you, it is enough. The other proposition, ' That the prosecution must affirmatively prove that the prisoner's mind was in a condition to form the intent,' is involved in the general proposition which I have submitted to you. The

other proposition in regard to intoxication, and in regard to the purpose for which evidence of intoxication is allowed to go to the jury, also in regard to the presumption of law, and the general presumption that the prisoner is entitled to every reasonable doubt, I have already charged."

There was no exception to the charge as given; nor was there any specific request to charge differently on any point. The jury found the prisoner guilty of murder in the first degree.

An extra panel of one thousand jurors was ordered by the Court of General Sessions to be summoned for the term at which the prisoner was tried.

On the 13th February, 1865, the following certificates of the drawing and summoning of the jurors, was filed in open court.

        " CLERK'S OFFICE,               ⎱
CITY AND COUNTY OF NEW YORK. ⎰

I hereby certify that the following is a list of the persons constituting an ex-panel of one thousand jurors for a Court of General Sessions, to be held at the New Court House, in said city, on the 13th February, 1865, at 11 o'clock in the forenoon, drawn by the clerk of the said city and county, on the 7th day of February, 1865, in the presence and with the assistance of the undersigned attending officers, duly notified for that purpose.

                   D. A. FOWLER,
                      *Deputy County Clerk.*

**SHERIFF'S RETURN.**

| Names. | Ward. | Condition. | Residence. |
|---|---|---|---|
| Andrew, J. S., . . . . . | Eighth, . . . . . | Jeweler, . . . . . | 145 Water street. |

Here follows in like manner nine hundred and ninety-nine other names. At the end of names follows:

All of which is hereby certified

D. A. FOWLER,
*Deputy Clerk of City and County of New York.*

JOHN J. V. WESTERVELT,
*Under Sheriff.*

IGNATIUS FLYNN,
*Alderman, Fifth District.*

BERNARD KELLY,
*Alderman Twelfth District.*

I hereby certify that the manner of summoning the persons named in the foregoing list, appears in the margin opposite to each name, the letter S. meaning personally notified, the letters W. S. meaning a written notice, left with a person of proper age at the place set forth in said list as the residence of the juror, and the letters N. F. meaning not found.

JOHN KELLY, *Sheriff.*"

On the 13th February, the trial upon the indictment being moved, the prisoner made and filed a challenge to the array of jurors, " upon the panel for list of jurors this day filed in this court," and alleged as cause of challenge:

First. That the sheriff who summoned the persons named as jurors upon said panel or list, was not, when he so summoned them, indifferent between the People of the State of New York and the prisoner at the bar, but then had formed or expressed an opinion with reference to the guilt or innocence of the prisoner at the bar, of the matter whereof he now stands indicted.

Second. That the sheriff or his under sheriff, or any county judge of the county of New York, or any justice of the peace, or any officer or officers, or judge or judges, having the powers in such case of the sheriff, under sheriff, county judge or justice of the peace, did not

appear at the office of the county clerk, or witness the drawing of the persons named as jurors in said panel or list from the petit jury box in the office of said county clerk.

Third. On drawing from said jury box of the names or ballots of the persons now on said panel or list returned as jurors, no minute was kept by any attending officer, or by any person for any attending officer, of the drawing of such names or ballots.

Fourth. No minute of such drawing was signed or certified by any attending officer, but that the certificate or pretended certificate was signed at the end of several blank sheets of paper, which said sheets did not contain the names of the persons drawn as jurors, but were left blank thereafter, to wit, after the signing of the said pretended certificate, to be filled in with the names of the persons as jurors.

Fifth. Said certificate or pretended certificate was not, at the time of the drawing, signed by the attending officers, but was signed only by the deputy county clerk and Ignatius Flynn, alderman, &c.

Sixth. No copy of the minutes of the drawing of said jurors was delivered to the sheriff of the city and county of New York before he summoned the persons named as jurors in the said panel or list to attend as jurors here in this court.

Seventh. Said sheriff, before any copy or pretended copy of the minutes of the drawing was delivered to him, summoned as jurors certain persons whose names upon ballots had been delivered to him by the county clerk, which said ballots were afterward returned by said sheriff to said county clerk, and the names were then, by said county clerk, entered in a book in the office of said county clerk as a minute of the drawing required by law, and thereupon and after said persons had been summoned as jurors, to wit, on the 11th of February, 1865, a copy or pretended copy of the names so entered in said book was delivered

as a copy of the minute of the drawing to said sheriff, which said pretended copy is the panel or list of jurors, the array of which the prisoner at the bar now challenges.

Eighth. The said panel or list is not a copy of the minutes of the drawing of the said jurors by the county clerk, as certified by the attending officers at said drawing ; all of which the said prisoner at the bar is ready to verify. Whereupon he prays judgment that said panel be quashed. The district attorney demurred to said challenge to the array of said panel, and the prisoner joined in demurrer. The recorder sustained the demurrer, overruled the said challenge, and refused to quash the array, and an exception was taken by prisoner to such ruling.

On the trial, there were numerous challenges of jurors by the prisoner ; the proceedings in which, the decisions of the recorder on those for principal causes, and his instructions to the triers when they were interposed to the favor, are sufficiently stated in the following opinion.

From the judgment of the General Sessions, the prisoner brought error to the Supreme Court, when the judgment of the Sessions was affirmed.

He now brings error to this court.

*John McKeon* and *John Sedgwick,* for plaintiff in error.

*A. Oakey Hall,* for defendant in error.

WRIGHT, J. The evidence, which was undisputed, disclosed a clear case of murder. The accused and the deceased were keepers of adjoining liquor and lunch saloons, in this city, in the early part of January, 1865, and had been for several months previously. No direct proof was given of any personal difficulty prior to the occurrence which resulted in the death of Lazarus, though from their acts and expressions on that occasion, it is to be inferred that ill feeling existed between them. About three o'clock on the morning of the 3d January, the accused and three of his companions (Clark, McDonald

and California Jack), were assembled in his bar-room. Clark and McDonald had been riding about the city, making New Year's calls, and at that late hour brought up at Friery's saloon, partially intoxicated. Friery himself had been engaged in the same way with another of his companions, and some seven or eight hours previously was lying on his bar-room table deeply intoxicated. He had gone, or been taken to bed, where he must have slept away in some degree, the brutalizing effects of his potations, for about half-past two o'clock, at the instance of his companions who visited him, he got out of bed and came down to the bar-room. He was there when Clark and McDonald entered. The person named California Jack was also of the party as has been stated. Clark and McDonald were in Friery's place but a few moments, when the four proceeded to the saloon kept by Lazarus. They were all more or less under the influence of liquor, but neither of them so drunk as to be unable to walk. The purpose of the visit was evidently a disorderly and riotous one, if nothing more. As they entered, California Jack (who seems to have been picked up at Friery's place for the occasion), offered to bet ten dollars ($10) that he had a man who could whip any man in the house, and turning to Friery, asked him "what his weight was?" There were no persons in the house other than Lazarus, who was somewhat intoxicated, his bar-keeper, and a young man named Richards. Calling for cigars, and lighting them, California Jack said again, addressing Lazarus, "I'll bet ten dollars ($10) I've got a man here that will take that pistol from you, Harry?" whereupon Lazarus replied, that he "would bet he had not, for he had no pistol," and throwing open both of his coats showed them that he had none. Observing the inclination to create a disturbance, the bar-keeper said to McDonald and Clark that he hoped they would have none there, and they promised him there should not be. Lazarus was standing by the table near the stove, and Clark went over

to him, and, as the bar-keeper testified, "kind of made up
friends." Friery then mockingly advanced to shake hands
with Lazarus, but the latter held down his head, and shak-
ing it, said, "I don't want to shake hands with you,"
adding further, that he hoped they did not come in to
raise any disturbance. Upon Lazarus refusing his hand,
Friery leaned back on the counter, saying "You are a
dirty little loafer." Lazarus had his right hand, that was
wounded, wrapped in a handkerchief, and upon this
remark of Friery's he unrolled the handkerchief from his
hand, and threw it over the bar, and said "I will fight
you anyway now." At this instant, the bar-keeper testi-
fied, he turned round to get some cigars for the party, and
as he turned he heard Friery use the expression "You are
a good little man, Harry," and turning back to the counter
he saw him draw a dirk knife from the neck of Lazarus.

This knife, he described as being a two-edged dagger
knife, with a blade some seven or eight inches long, which
had been exhibited by the prisoner in Lazarus' bar-room
the morning before. Richards, another witness, sat by the
stove, with perhaps a better chance for observation. His
statement was, that Lazarus stood at the table by the
stove, and the prisoner by the bar, whilst the altercation
of words was going on; that the latter walked over toward
the table, pulled out the knife and plunged it into Lazarus'
neck. Lazarus staggered over against the table, and was
caught by the bar-keeper before falling on the floor. The
prisoner and his party forthwith fled the premises, the pris-
oner exclaiming as he left, "He is a good little man, but
I guess I have fixed him." What became of California
Jack did not appear. Friery, McDonald and Clark got
into a sleigh that was in waiting at the door, and ordered
the coachman to drive off. They were driven up the
Bowery, stopping at a place called the "Rambler," where
they drank liquor; and from thence were driven to the
corner of the Third avenue and Ninety-second street
(near Yorkville), when they discharged the sleigh. On

their way up town, Friery and Clark, who sat together on the back seat of the sleigh, were noisy and boisterous, and McDonald, who sat with the driver, took the lines and put the horses on a run. In the course of the ride, one of the party remarked, " He is dead now, the son of a bitch." After discharging the sleigh, they were lost sight of for some eight or ten hours. About one o'clock in the afternoon of the 3d of January, two policemen who were in pursuit, traced them to a drinking saloon in a remote part of the city. One of these policemen was known to Friery, and as he entered the saloon, the latter made the inquiry as to what he was doing there. The policeman answered that he wanted him, and put the question whether he was not down at the " shindy" at Lazarus' that morning ? To this the prisoner replied, " Never mind, take a drink." In the course of the conversation, the question was asked whether Lazarus was dead, and upon being told that he was, he was inquired of again, whether he was not down there, and implicated in the killing. His answer was, " Yes, I have killed him, and I'll dance at his wake." Lazarus survived but a brief period, having been stabbed in a vital part of the neck. Indeed, the bar-keeper who caught him as he staggered forward, and laid him upon the floor, supposed him to be then dead.

Upon this presentation of facts, there could have been but one conclusion justly reached. A more open, unprovoked and brutal murder has rarely stained the annals of crime. The prisoner, with his half inebriated associates, at the dead hour of the night, visits the premises of his rival in business, if not in other ways. It may be that personal violence was not originally contemplated, though from their conduct and declarations immediately upon entering there is reason to suppose that they had it in view. Lazarus was there, but in no condition to resist them. Besides having a wounded hand, he had been drinking liquor. From what passed between the prisoner and the deceased before the fatal blow was struck, it is

probable that there had been some previous difficulty between them. On no other hypothesis, can this barbarous act of the prisoner be accounted for. He was excited in some degree by liquor, but there is no pretense from the evidence that he was insensible, or that his conduct was not entirely under the control of his will. Lazarus, it is true, had refused to take his hand, and upon his calling him "a dirty little loafer and coward," had offered to fight him; but no blows were struck, nor were they at any time in contact. No sudden passion was aroused, no provocation given, for Lazarus was not in a state to excite passion or provoke present violence. Under these circumstances, with mock words of friendship upon his lips, the prisoner passes from the bar to the table where Lazarus was standing and strikes his knife into his neck. Wrenching it from the neck, he turns and leaves the premises, exclaiming as he goes, " He is a good little man, but I guess I have fixed him," and hours afterward, when told of the fatal result, utters the brutal expression, " Yes, I have killed him, and I'll dance at his wake."

Under the statute of 1855 (Laws of 1855, ch. 337, § 3), our jurisdiction extends to ordering a new trial, if satisfied, that " the verdict was against the weight of evidence or against law, or that justice requires a new trial." Manifestly, there was no injustice in this case in the verdict of the jury; the evidence and the circumstances under which the homicide was perpetrated, called for no other; it was, in truth, a case of wanton killing without any provocation. It cannot be contended, for a moment, that the accused did not design to kill. Not under the impulse of sudden passion (for there had been no provocation to arouse it), he comes upon the deceased, and with inhuman and fiendish spirit and intent, plunges a deadly weapon, that had been before concealed upon his person, into a vital part of the neck of his victim; it is very clear that unless the accused was prejudiced in his trial by some erroneous legal ruling, " justice does not require " a reversal of the

conviction. Various exceptions and objections were taken
on the trial. Some of them are insisted on as valid in the
points of counsel, but none were confidently urged on
the argument as errors of a nature to demand a new trial,
except the one relating to the drawing and summoning of
the extra panel of one thousand jurors for the term of the
court at which the trial was had. These objections, how-
ever, insisted on now, though not urged at length, and which
relate to the impanneling of the jury and the admission
and rejection of evidence, will be briefly noticed before
attending to what is claimed to be a fatal error in the
case. I think it will be seen that none of them are
tenable.

1. *The rulings of the court as to evidence.* It appears
that although the accused and the deceased were main-
taining the same kind of business, the former, from some
unexplained cause, was in the habit of visiting the latter,
and there drinking himself and treating strangers to
drinks. Between four and five o'clock of the morning
before the homicide, he made one of these visits ; he had
with him a two-edged dagger knife, having a blade seven
or eight inches long. Leaning against the counter, he
drew the knife from his pocket and plunged it into the
counter saying, "that will be the death of somebody
around here before long," or "somebody here ;" Lazarus
was not present. On the evening of the same day (Laza-
rus being absent), he came in again, stepped to a lunch
table; eat something; seized the mustard cup from the
table, threw it across the room and left the premises.
About two weeks before the homicide, between seven and
eight o'clock in the morning, he came in with one of his
companions, and called for a drink; there was a New-
foundland dog, kept by Lazarus, lying sick under the
table; before drinking he took an ice pick from his pocket,
and hit the dog three or four times on the head, then,
taking part of his drink, he commenced beating the dog
again, and thrust the sharp end of the ice pick into the

dog's mouth, breaking out some of his teeth. He was finally persuaded by his companion to desist. These several acts and declarations of the accused upon the premises, and with the property of Lazarus, were, under objection, allowed to be proved by the prosecution; this was not error. The evidence was admissible as bearing upon the question of malice in the commission of the crime with which the prisoner was charged. Proof of exhibiting at the scene of the homicide, the morning before its perpetration, the identical weapon with which the fatal blow was given, accompanied by the declaration, "that that would be the death of somebody around here before long," was not only competent, but exceedingly pertinent testimony. The occurrence as to the dog was of lighter weight, but still it was not incompetent testimony. Proof of any act of the accused in reference to the deceased, or his property, about the time of the fatal occurrence, indicating, or tending to indicate, feelings of personal hostility toward the deceased, was competent.

2. On the cross-examination of Lazarus' bar-keeper, he was asked, "Did a part of the custom of that house come from women?" The question was objected to as irrelevant and immaterial, and excluded under exception. There is no point in the exception. It was of no sort of importance what were the classes or sex of the customers of Lazarus.

3. It appeared, as has been stated, that just before leaving for Lazarus' saloon, Clark, McDonald, California Jack and the accused were together in the bar-room of the latter. On the examination of a witness on the part of the accused, he was asked, "Do you know what, if anything, was said between California Jack, Clark, McDonald and Friery, in his (Friery's) bar-room?" The district attorney objected to the question, and the objection was sustained. It is unnecessary to say a word in justification of this ruling. It was utterly immaterial what they talked about as affecting any issue in the case.

Vol. II.    56

4. Six persons drawn as jurors were challenged for principal cause by the counsel for the prisoner. The court held that the challenges were not sustained by the evidence adduced in their support, and they were challenged peremptorily by the prisoner. Two others so drawn were challenged for favor, and found by the triers to be indifferent, and were peremptorily challenged by the prisoner. Two others so drawn were, in the first place, challenged for principal cause by the prisoner's counsel.

The court found the causes of challenge untrue, they were then challenged for favor, and found indifferent by the triers. These were, also, peremptorily challenged by the prisoner. In each of these cases, exceptions were taken to overruling the challenges for principal cause; and also the charges or instructions of the recorder to the triers. It is now urged that these exceptions are open for examination and review, and that if there were error in the proceedings upon the challenges for cause, though the jurors were ultimately excluded by the peremptory challenges of the prisoner, he is entitled to a reversal of the judgment. This is not so. Questions raised previous to the peremptory challenge of these jurors, are not open for examination at his instance. As was said by the distinguished judge, in delivering the opinion of the court, in the case of *Freeman* v. *The People*, 4 Denio, 9, "The prisoner had the power and the right to use his peremptory challenges as he pleased, and the court cannot judicially know for what cause or with what design he resorted to them. He was free to use or not to use them, as he thought proper; but having resorted to them, they must be followed out to all their legitimate consequences. Had he omitted to make peremptory challenges, his exceptions growing out of the various challenges for cause, would have been regularly here for revision. But he chose by his own voluntary act to exclude these jurors, and thus virtually, and as I think, effectually blotted out all such errors, if any, as had previously

occurred with regard to them." All questions in respect to the ten jurors mentioned (the proceedings on the challenges of whom for cause, are set forth at large in the bill of exceptions) are out of the case. The accused, having used his peremptory challenges, having chosen by his own voluntary act to· exclude them, cannot be heard to allege exceptions, if any, existing as to those jurors prior to such challenges. Eight persons, however, were drawn and served as jurors, to whom challenges were interposed by the prisoner's counsel, and it is to be seen whether any error occurred with regard to them, either in overruling the challenges for principal cause, or in the recorder's charges to the triers.

First. *James R. Davies*, on being called, was challenged on the ground that he did not own real estate, and had not been taxed for personal estate. The juror testified that he did not own any real estate, had not yet been taxed for it, but expected that he would be during the year. The recorder overruled the challenge. This was not error. The provisions of the Revised Statutes respecting property or assessment qualifications of jurors (2 R. S., 411, § 13), were repealed, as to the city of New York, by an act passed in 1847, entitled "An act in relation to jurors in the city of New York." . Laws of 1847, ch. 495. That act declared, that it should not be necessary as a qualification for any juror in the city of New York, that he should be actually assessed therein ; but that all persons, residing in the city, who should be qualified to serve as jurors, and not exempted by any of the laws of the State, should be selected as such, whether they had been assessed or not. The objection to the juror was therefore untenable.

Second. *Charles E. Hadden*, on being called, was challenged for " principal cause." The bill of exceptions does not show, in terms, what cause of challenge was alleged, but from the scope and character of the evidence it seems to have been that the juror had formed an opinion *that a*

*crime had been committed.* The juror testified in substance, on being interrogated by prisoner's counsel, that from the general conversation in the court room, and from what he had heard over the bar, he had formed an opinion that a crime must have been committed, but had no impression whatever whether the party who is indicted is the party who did the thing. The challenge was properly overruled by the court. It is not a good cause of principal challenge, that a presented juror, from what he has heard or read of a particular transaction, has an opinion that a crime has been perpetrated by somebody. The juror was then challenged for favor, and the triers passed upon this challenge upon the same testimony; the prisoner's counsel requesting the court to charge the triers, that if the juror had made up his mind that a crime had been committed, he might be biased by that, although he had no impression as to who committed it. The recorder declined to give the instructions requested, but charged the triers as he had before charged in general terms, that if they thought, after hearing the testimony of the juror, that he has a bias against the prisoner, they must say the challenge has been sustained; if they say, he is impartial and has no bias, they must say the challenge has not been sustained. There was no error to have refused giving the instructions requested, but on the contrary, the instructions given were guardedly correct. In fact there was nothing in the evidence to support the challenge to justify the request. There was not a scintilla of proof tending to show that the juror challenged had made up his mind even upon the abstract question of whether a crime had been committed.

Third. *Nathan Brewster*, on being called, was challenged for principal cause. On being interrogated by the prisoner's counsel, he testified that he had read something of the transaction at the time of its occurrence, referring to the homicide of Lazarus, but had formed no opinion about it. From what he read he thought there had been some crime committed. On being interrogated by the

court, he further testified that he had formed no opinion at all as to whether the prisoner is guilty of the crime with which he is charged. The challenge was overruled. It is claimed in the points of the prisoner's counsel, that the court should have rejected this juror, for the reason that he had read something of the transaction, and had formed an opinion that a crime had been committed. There was nothing to show that the juror had formed any opinion in respect to the transaction, either as to its legal character or as to the guilt or innocence of the accused on trial; but it may as well be said, once for all, that it is no sufficient ground of principal challenge that a proposed juror, from reading or hearing of a particular homicide, gets an impression on his mind, or concludes that a crime, and one of murder, had been committed, without any reference as to who was the perpetrator. The law has not reached the point of positively disqualifying a juror for forming or expressing an opinion as to the legal character of a given transaction. Whether, as in this case, the killing of Lazarus was a criminal act, irrespective of any opinion or knowledge as to who committed the act.

Fourth. *John Woods*, on being called, was first challenged for principal cause. He testified, on examination of prisoner's counsel, that he had read of the transaction in the papers; could not say that he had formed any opinion as to the guilt or innocence of the party charged; formed the opinion that the party had committed a crime. On the question being put to him by the district attorney, whether he had actually formed an opinion that Bernard Friery was either guilty or innocent of killing Harry Lazarus? he answered no. The challenge was properly overruled. The juror had formed no opinion either as to the guilt or innocence of the accused on trial. He had read an account of the homicide in the papers, and had come to the conclusion that the party charged had committed a crime. This, as has been said, did not legally disqualify him. The juror was then challenged for favor, and further

examined, both by the prisoner's counsel and the district attorney. The recorder charged the triers, in substance, that it was for them to determine whether the juror was indifferent between the prisoner and the people; that no rule of law could be laid down to determine with unerring certainty; it was not a question to be solved by any rule of law, but by the common sense of the triers. They were to hear what the person called as a juror answers, to look into his mind to see its condition, and if, after examining that, they come to the conclusion that he is impartial between the prisoner and the people, has no bias one way or the other, it was their duty to say that he is competent, and that the challenge is not sustained. But, if after considering the state of his mind, they find to the contrary, that he was not indifferent, they should say so, and sustain the challenge. These instructions were unexceptionable.

Fifth. *John H. Hazen*, on being called, was challenged in the first place, for principal cause. On being interrogated, he answered in substance that he had read of this matter (the interrogatory probably referring to the matter on trial, though not in terms stated); he did not know but he might at the time he read of it, have formed an opinion on this matter; his memory was rather treacherous; should not have remembered the principal facts stated in the newspapers, if he had not heard them recounted since he had been in the court room; had no impression or belief as to whether what he read in the paper was true or not; did not recollect of having any impression as to whether the party charged by the newspapers did what the newspapers said he did. The challenge was overruled properly, as there was not a scintilla of evidence to support it.

Sixth. *Benjamin F. Eaton*, being called, was challenged for principal cause. He testified that he heard the matter spoken of at the time, and thinks he must have said something about it, but is not positive; thinks it must have

been something like this, that if the party charged did commit the murder, he ought to be punished; and if the principal facts were true that he heard, he has that opinion now. On being interrogated by the district attorney, he stated in substance, that from a conversation in the shop (where was all he heard about it), he had derived an impression that some one had killed Lazarus, but who was the person charged with the killing he did not know; it might have been told to him, but he had no remembrance of it; thinks he has an impression that somebody was taken up for it, but does not remember the name or anything about the man; had no fixed opinion in his mind founded on what he heard talked of; that the man, whoever he was, that was taken up, was guilty or innocent of killing him. The challenge was properly overruled. It was totally unsustained by the evidence. The person had no opinion as to the guilt or innocence of the accused. In fact he had nothing that would be called an opinion, or even an impression of the mind, upon any feature of the case.

Seventh. *William H. Hicks*, being called, was challenged for principal cause. He testified that he had read and talked of the matter, but had formed no opinion as to it; thinks he has formed an opinion as to whether a crime was committed, but has never expressed it. His opinion that a crime was committed, attaches to no individual; the challenge was overruled. It is unnecessary to repeat what has been before said, that the formation or expression of an opinion as to the legal character of a given transaction, attaching criminality to no particular individual, and especially not to the accused, who is on his trial, is no sufficient ground for principal challenge.

Eighth. *Charles F. Newton*, on being called, was challenged for principal cause. He testified, that he had read about the matter in the Herald; his reading did not lead him to the formation of any opinion; he had an opinion from the reading, that a difficulty had occurred in a drink-

ing saloon between two parties, the result of which difficulty was that a person was injured, and afterwards died; he believed that was a crime; to the best of his recollection, the article in the newspaper charged some person with the act which caused the death; the challenge was overruled. I imagine it would be difficult to assign any valid reason for rejecting this juror. The evidence fell short of sustaining even the favorite point of the prisoner's counsel, that he had formed an opinion from reading an account of the affair in the newspaper, that a crime had been committed.

I have thus gone through at length the same proceedings on the challenges of the persons sworn as jurors. In my opinion. there was no pretext for alleging error, either in the recorder's decisions of the principal challenges, or in his instructions to the triers when challenges were interposed to the favor. In the former the challenges were not sustained by the evidence, and in the latter the judge's instructions were guardedly correct and remarkably free from usurpation of the triers' province. There was no error in deciding or sustaining or instructing, substantially, that the formation or expression of opinion, or the possession of a bias, was immaterial, unless that such opinion or bias was against the prisoner, *per se.*

The remaining matter to be considered is in respect to the challenge to the array. The court, in addition to the regular and usual panel, had ordered an extra panel of one thousand jurors to be summoned for the Sessions or term at which the prisoner's trial was moved. This was done under the authority of the act of December, 1847 (before referred to), creating the office of commissioner of jurors for the city of New York, and defining his powers and duties, the ninth section of which provided that after the commissioner had completed the petit jury list, and delivered a certified copy thereof to the county clerk, and the clerk had prepared the ballots and deposited

them in the box in the manner required by law, " the several courts in the city may order as many jurors to be summoned for their respective courts as in their judgment may be necessary." Laws of 1847, ch. 495. This act further provided that jurors for the several courts in the city should, on requisition made by such courts respectively, directed to the county clerk, " be drawn from the petit jury box in his office, a minute of which drawing shall be certified and filed with such clerk as now required, who shall deliver a copy thereof to the officers authorized to summon such jurors, who shall proceed to summon such jurors in the manner now required by law." § 4. It was conceded that the panel of jurors was to be drawn and summoned, as directed in article 2, title 4, chap. 7, third part of the Revised Statutes, entitled " of the return and summoning of jurors." 2 R. S., 410. The directions are to this effect : The clerk to give notice of the drawing, and serve a copy of such notice on the sheriff of the county, and upon the first or some other judge of the county courts, three days previous to the time appointed by him therefor. At the time so appointed, it is made the duty of the sheriff, in person, or by his under sheriff and the first or other county judge on whom such notice shall have been served, to attend at the clerk's office to witness the drawing. If the sheriff or county judge so notified do not appear, the clerk is to adjourn the drawing until the next day, and by written notice require the delinquent sheriff or judge, or some other county judge or any two justices of the peace, to attend such drawing on the adjourned day. If on the adjourned day, the sheriff or under sheriff and a county judge or justices of the peace appear, or if any two county judges or justices of the peace appear, but not otherwise, the clerk is to proceed, in the presence of the officers so appearing, to draw the jury. The clerk is to conduct the drawing in a prescribed way, a minute is to be kept, and each name entered thereon as drawn from the box before

another ballot be drawn.   After the drawing is completed a minute is then to be signed by the clerk and the attending officers, and filed in the clerk's office, and a list of the names of the persons so drawn, with their address and places of residence, and specifying for what court they were drawn, is to be made and certified by the clerk and the attending officers, and delivered to the sheriff of the county.   The sheriff is to summon the persons named in such lists to attend such courts by giving personal notice to each person, or by leaving a written notice at his place of residence ; and return the list to the court, at the opening thereof, specifying those who were summoned, and the manner in which each person was notified.  2 R. S. 413, 414. In the city of New York a copy of the minutes of the draw-. ing, certified and filed with the clerk, takes the place of the *list* to be delivered to the summoning officer.  On the 13th February, the drawing and summoning officers, named in the statute, filed their statutory certificate of compliance with the statutory forms of drawing and summoning the extra number of one thousand jurors as ordered ; which was received by the court.   On the prisoner's trial being moved the same day, he interposed a challenge in writing to the array of the persons upon the panel or list of jurors this day filed in this court, alleging eight grounds of challenge, the first of which was, that the sheriff or summoning officer had formed and expressed an opinion as to the guilt or innocence of the prisoner ; and the next seven grounds, a want of compliance with the statutes in respect to the jurors, viz., that the proper officers did not actually attend at, or witness the drawing ; that upon the drawing from the petit juror box of the names of the persons now on the panel returned as jurors, no minute was kept by any attending officer as the drawing proceeded ; that no minute of the drawing was signed or certified by any attending officer; some of the proper attending officers signed blank certificates which the clerk filled up after the drawing ; no copy of the minutes of the

drawing was delivered to the sheriff; the sheriff summoned the jury without any copy of the minutes being furnished him; the ballots drawn from the jury box were delivered to him from which he summoned the jurors; and the panel or list filed is not a copy of the minutes of the drawing. There was no allegation of any fraud or corruption against any of the officers who drew or summoned the jurors, or certified to the list; nor of any injury or prejudice to the prisoner. Upon a demurrer by the district attorney, the court sustained it, overruled the challenge, and refused to quash the array; to which ruling the prisoner excepted. The question is, was this error, entitling the plaintiff in error to a new trial? I am of the opinion that it was not; and that the challenge was properly disallowed. Plainly the first ground of challenge was without substance. The idea that the mere expression of an opinion by the officer, designated by law to summon jurors, as to the merits of a cause that may chance to be on the calendar of a court for trial, or in respect to the guilt or innocence of a party under indictment, is matter for challenge, to the array, is as absurd as it is novel. But this ground was not pressed or relied on in the argument at bar. The remaining allegations related to the non-observance of certain of the statutory directions in the drawing of the panel, the challenge averring, in substance, that the clerk drew the jury, without the officers named in the statute being actually present at the drawing; that no minute of the drawing, upon its completion, was signed and certified by the proper officers, and filed with the clerk, nor any copy of such minutes delivered to the summoning officer; but that the ballots drawn from the jury box were delivered to him by the clerk, from which he summoned the jurors, and that after such summoning the ballots were returned by the sheriff to the clerk, the names then entered by the latter in a book in his office as the minute of the drawing. Assuming that the truth of the facts, as stated in regard to the drawing, were admitted by the demurrer, was

the non-observance of the statute directions and forms in the particulars suggested, grounds of challenge to the array by the prisoner? Certainly not, unless the purpose and intent of the statute for selecting, drawing and summoning persons as jurors were to secure an impartial jury to parties; and to that end, the regulations and forms prescribed were made imperative upon those charged respectively with the duty. In such case it would be the right of a litigant to have the statute regulations and forms strictly complied with, independent of any suggestion of fraud or misconduct. But, in my view, the statute respecting the selecting, drawing, and summoning of jurors, was not intended *per se*, to secure impartial jurors to litigants. The purpose and object of the statutory system were to secure a due and uniform distribution of jury duty, and to guard the great body of jurymen from the fraud or favoritism of the drawing or summoning officers. The statutes establish a mode for these ends, and are directory to those whose duty it is to select, draw and summon. By this system, the courts are supplied with jurors to aid in the administration of the laws. If it were held that the statutes in reference to the selecting, drawing and summoning of persons to serve as jurors were other than directory; if any of the many directions therein contained were to be deemed sufficient to vitiate the whole panel, the consequences would be that the whole fabric of justice would fall to the ground. Suppose, for example, the clerk omits to give public notice of the drawing, or the drawing takes place in the absence of those officers required to attend and witness it, after there had been an adjournment and a notification by the clerk to attend on the adjournment day, are these irregularities ground for vitiating the whole panel? If so, the business of every court in the State might be impeded if not wholly stopped. The officers named in the statute charged with the duty of attending the drawing as witnesses, by a neglect of such duty would deprive the court

of jurors to aid in the administration of the laws. The system contemplates no such result, but on the contrary, was designed and intended to promote a directly opposite purpose. The omission to properly work the statute machinery by the drawing and summoning officers, is a question between the people and those officers; because any fraud or partiality, or improper conduct of such officers injured the public, such conduct was made a misdemeanor. 2 R. S., 694, § 18. The machinery may be perverted so as to injure litigants, but in such a case it is the acts of perversion that become cause for challenge and not the mere omission to properly work the machinery, when no injury or prejudice comes to litigants. The challenge in this case merely alleges a defective working of the drawing machinery, without its terms imputing a perversion thereof to the injury of the accused. It not only omitted express allegations of prejudice to the accused, by the acts or omissions complained of, but showed on its face that by means of the imputed irregularities the same jurors were arrayed who would have been on the panel if every imputed omission had been supplied, or if every act had been technically regular. It asserts, in terms, that the very ballots which were drawn from the box by the clerk, were handed to the sheriff, and each juror whose name was on each ballot was summoned. That the jurors were fairly drawn from the box, and that the same persons were drawn and summoned that would have been had the proper officers attended and witnessed the drawing, is to be assumed, since no allegations to the contrary is contained in the written challenge.

I am of the opinion, therefore, that it was not error to disallow the challenge and refuse to quash the array. The acts and omissions complained of, the mere defective working of the statute machinery by the drawing and summoning officers, in the absence of any suggestion of fraud or misconduct prejudicing litigants, or any misconduct, save a neglect or omission to strictly observe the

prescribed regulations, is not ground of challenge to the array.

The judgment should be affirmed.

Concurring, PECKHAM, PORTER and LEONARD, JJ., and DAVIES, Ch. J.

HUNT, J., thinks the challenge to the array should have been sustained. Concurring, SMITH and MORGAN, JJ.

Judgment affirmed.