JOHN DOLAN, PLAINTIFF IN ERROR, *v.* THE PEOPLE, DEFENDANTS IN ERROR.

6h 493<br>37 Mis'353

*Grand jury in city of New York — irregularity in drawing of — commissioner of jurors — authority of — General Sessions — transfer of cases to Oyer and Terminer — indictment — duplicity — murder in the first degree, indictment for.*

Under the provisions of 3 Revised Statutes (5th ed.), page 701, section 37, requiring the names of the persons appearing on the lists prepared and filed, as required by sections 35 and 36, to be placed in a box, and the names of the persons to act as grand jurors to be drawn therefrom, there is no authority for the officer drawing the grand jurors, or the court before which they may be

summoned, to go behind the proceeding of the board by which the list was prepared, for the purpose of nullifying the action of the grand jury, after its formal organization.

The power of the mayor of the city of New York to appoint, in pursuance of an act of the Legislature, a commissioner of jurors to prepare the lists from which the names of the persons to serve as petit jurors are to be taken, cannot be tried on a challenge to the array of the jurors so drawn.

The plaintiff in error was tried in the Court of Oyer and Terminer upon an indictment transferred to that court, by the Court of General Sessions. Upon this writ of error, the plaintiff insisted that the trial court had no jurisdiction, as it did not appear, from the record, that the order of the Court of General Sessions had been entered in its minutes. *Held* (1), that, as it did not appear that the order had not been entered, it would be presumed that it was; (2) that it was too late to now raise this objection for the first time.

The Court of General Sessions has power to transfer a case to the Court of Oyer and Terminer, even if the latter court be then in session; by the next Court of Oyer and Terminer, the legislature intended the next court at which an indictment could be tried.

The first count in the indictment set forth facts showing that the plaintiff in error had committed the crime of burglary, and then alleged that while engaged in the commission of this felony, he inflicted upon the deceased a mortal wound, from which he died ; the second count set forth facts showing that the plaintiff in error had committed the crime of robbery, and then alleged that while engaged in the commission of this felony, he inflicted upon the deceased a mortal wound, from which he died. *Held*, that the indictment was not bad for duplicity ; that to constitute murder in the first degree, the killing must have been committed while the plaintiff in error was engaged in the commission of a felony, and that if the facts showing this to have been the case were too fully set forth, it was mere surplusage, for which the conviction would not be reversed.

The plaintiff in error was indicted for murder in the first degree, the first count alleging that he killed the deceased while committing a burglary, the second, while committing a robbery, and the third, with deliberation and premeditation. The jury found a general verdict of guilty of murder in the first degree. *Held*, that the verdict should not be set aside as an inconsistent or improper one.

The law requires no particular period for, or amount of deliberation, to constitute the crime of murder in the first degree; it is sufficient that deliberation, combined with the attempt to take life, existed in the case, and that the mortal blow or wound was given in consequence of it.

WRIT of error to the New York Court of Oyer and Terminer to review the conviction of the plaintiff in error, of murder in the first degree.

*Wm. F. Howe*, for the plaintiff in error.

*Benj. K. Phelps*, district attorney, for the defendants in error.

Daniels, J. :

The indictment against the prisoner was found and presented by a grand jury of the Court of General Sessions, at a term held on the first Monday of October, 1875. To this indictment, upon his arraignment, he interposed what was relied upon by him as a plea in abatement, by which he averred that the grand jury presenting the indictment against him was not lawfully created and organized. The same point has been previously before the court upon an application for a writ of error on the prisoner's behalf, with a stay of proceedings; and, upon the consideration then given to it, the court arrived at the conclusion, that it was not tenable, and, for that reason, overruled it, and denied the stay. That and a similar objection taken to the petit jurors drawn for the trial of the indictment, were the only grounds then urged, in the prisoner's behalf for a stay of execution of the judgment pronounced against him. But, after those objections were held to be unsupported, another application was made to a justice of this court for a writ of error, with a stay of proceedings, and other reasons were urged in its support, upon which it was allowed to be successful. The writ which was then issued has now been returned, and the prisoner's counsel has, with much ingenuity and ability, again endeavored to maintain the validity of the objections previously overruled; and has presented other points upon which it has been insisted that the conviction of the prisoner should be reversed.

Under ordinary circumstances, the examination previously made of the points concerning the organization of the grand and petit juries should now be considered conclusive against any further discussion of them. But the gravity of the offense for which the prisoner has been convicted, and the importance of the objections presented, will supply a good reason for a further consideration of those points, and a departure from the rule which would ordinarily be observed in the disposition of objections once examined and decided. These objections are exceedingly important in their character. If they should prove well founded, in fact, and be allowed to prevail, as maintained in law, they would, at once, arrest the administration of justice in both civil and criminal cases, so far as that depended upon the intervention of juries, either grand

or petit. If they should be found to be well supported, no grand jury could be organized in the county of New York. No indictments could be found for crimes committed; and ·no trials could take place upon indictments heretofore presented. A carnival of unrestrained crime would then be assured, that would be as shocking to contemplate as it would be destructive to the good order and security of society. The calamity would be similar to that which could not fail to result from a complete abrogation of all criminal laws. For it would at once suspend their execution. Great care should be observed in official action, which might be attended with the development of such appalling consequences. And courts of justice could only be excused in tolerating them, for the most irresistible and controlling reasons. The objections taken should certainly be found to be most imperative in their nature, and undoubtedly supported by unanswerable reasons, before courts could yield to their control, for that would practically paralyze the arm of criminal justice. Have reasons of that nature been presented in support of these objections by the counsel for this prisoner? If they have not they must be again overruled, for the public security should not be exposed to even doubtful peril, on insufficient grounds. The reasons assigned in support of the objections urged against the power of the grand jury to find and present the indictments, are contained in what was relied upon as a special plea. By that, it was alleged, in terms, that Douglas Taylor was the commissioner of jurors in the county of New York during the year 1875. As such, the statute made it his duty to select the petit jurors for the year ensuing after such selection. Of the jurors so selected lists were required to be made, and a copy certified and filed with the county clerk. (3 R. S. [5th ed.], 698, § 20.) And from the names on such lists not only were the petit jurors to be drawn, but the grand jurors were also required to be selected. The statute upon these subjects was enacted in clear and explicit terms. For the purpose of selecting the grand jurors a board was created, consisting of the mayor of the city, the presiding justice of the Supreme Court in this district, the chief justice of the Superior Court of the city, the first judge of the Court of Common Pleas, the Recorder and City Judge of the City and County of New York. (Id., 700, § 32.) Four members of the board were required to

constitute a quorum (§ 33), and it was to be attended by the commissioner of jurors, or in his absence by a clerk appointed by the board. To enable it to discharge its duties, the petit jury lists were required to be produced before the board. And from them it was to select not less than 600, nor more than 1,000 persons to serve as grand jurors. (Id., 701, § 35.) It is not averred, by the plea, that this duty was not faithfully and regularly performed by the board. But it is alleged that the commissioner of jurors named in the plea, did not attend before them, but was prevented from so doing by the duress of the County Clerk. There is clearly nothing in this objection, because the board were authorized to supply his absence by the appointment of a clerk, and the plea contains no allegation that the board neglected to perform that duty. The important omission relied upon in the plea, was the failure to select the grand jurors from the petit jury lists made out by Douglas Taylor, as commissioner of jurors, and placing among the names selected for grand jurors, the names of persons who were not upon those petit jury lists, some of whom, it is averred, were upon the grand jury by which the indictment was found. This plea was demurred to, injudiciously, as it would seem, from the imperfect disclosure of the probable facts, and, as the demurrer was sustained, the facts well alleged in it must be acted upon as having been truly stated. But, while the averment was made that the jury lists made out by Douglas Taylor, as commissioner of jurors, were not produced to the board for the selection from them of the grand jurors, it was not alleged that they had no lists whatever of the petit jurors before them when they selected the grand jurors. The law imperatively requires that the board should have the petit jury lists before them, to enable them to select the names of grand jurors. Its duty could not be performed without them in some form. And yet the plea concedes that the board did select the names of persons who were on the petit jury lists, to serve as grand jurors. The objection is, that they were not wholly taken from the commissioner's lists of petit jurors. This necessarily concedes that they were mainly taken from such lists, which could not have been done unless they had the lists, or copies of them, in some form before them. The presumption is that the board did its duty, and it could not have done so, because it could not have legally

acted at all without the petit jury lists. Neither could it have selected grand jurors from such lists unless they had been in some form produced. The substance of the allegations, when taken together with the implied concessions contained in the plea, is, that, though Taylor himself did not appear before the board, it still did, in some form, have lists of the petit jurors, but not all that were made by Taylor; and, in making the selection of the names of grand jurors, the board included the names of persons who were not on petit jury lists, as Taylor had made them out. That is all there is of this plea, in point of fact, which leaves it to be plainly inferred, from the action of the board, that its members had before them some jury list or lists not made out by Taylor, as commissioner, from which the names of grand jurors were selected, some of whom were on the panel that found this indictment. Consistently with the plea, the lists referred to may have been made out by some person acting under the irregular authority of Douglas Taylor, or by some person, for the time being, having possession of, and claiming to be, the incumbent of his office. It is hardly conceivable that any of the lists could have been otherwise made. And if they were not, that could not invalidate the action of the board in making its selections. It had the power to act from the lists produced before it, and that it did so is manifest from what is alleged in the plea to have been done by the board. Its action would not be a nullity, because the evidence was defective upon which it proceeded.

That consequence has been carefully guarded against by the language of the statute, which required a list of the persons selected by the board, to be signed by its members, certified by its clerk, and filed in the office of the clerk of the county (3 R. S. [5th ed.], 701, §§ 35, 36). And as the plea did not allege the omission of either of those acts, their performance must be assumed from the force of the legal presumption that public officers perform their duty. From the lists so prepared and filed by the board the names were required to be taken and placed in a box, and from that the grand juries of the county were explicitly directed to be drawn. This action was to be taken wholly upon the lists prepared and filed by the board. The statute is imperative upon the subject, and it contains nothing that would warrant the officers drawing the grand jurors, or the court, before which they may be summoned, in going behind the

·proceedings of the board for the purpose of nullifying the action of the grand jury after its formal organization. (Id., §§ 35, 38.) But, if that could be done, the objections presented by the plea were entirely insufficient to require that result in this case. It may be, as it was alleged, that the lists from which a portion of the grand jurors was selected were irregularly made, for irregularities in the performance of ministerial duties are not unfrequently encountered. But the validity of official conduct, on which the great, and some of the vital, interests of society are dependent, is not to be denied for that reason. No such result is required, either by the statute or the authorities, even if some lists of petit jurors, which were produced before the board, had been irregularly made, in or out of the commissioner's office. It has not been claimed that any unfit or unqualified persons were selected and returned as grand jurors. The statute required that the board should select intelligent citizens of good character, and, so far as the board might be informed, possessed of the qualifications required of persons to serve as jurors for the trial of issues. (Id., § 35.) It has not been pretended that the board failed, in any respect, in the performance of that duty. And if it did not, then it is clear that the prisoner could not have been injured or prejudiced in the least, by the irregularity alleged in the lists from which the grand jurors were selected, and the grand jury was afterward formed. For that, as well as the other reasons assigned, the prisoner had no ground of complaint, and his plea was properly overruled. (*Ferris* v. *People*, 48 Barb., 18; 35 N. Y., 125; *People* v. *Harriot*, 3 Park., 112; *Bennett* v. *Matthews*, 40 How., 428, since affirmed on the opinion written by the General Term of the fourth department; *Friery* v. *People*, 2 Keyes, 424.)

The challenge made to the array of petit jurors, from which the jurors were drawn by whom the indictment was tried, has still less color of plausibility for its support; for it appears from the statement made, that the petit jury lists were made by a person in the office of commissioner of jurors, having possession and acting under color of an appointment to the office by the Mayor of the City of New York; and that was sufficient to render his acts valid so far as the prisoner and the public might be affected by them, as long as he continued to hold the office. Upon the lists prepared and filed

by him as the commissioner of jurors, the clerk was required, as he undoubtedly did, to prepare ballots and place them in a box, from which the jurors for the courts were afterward to be drawn. (3 R. S. [5th ed.], 698, §§ 20, 21.) And it cannot be that the proceeding could be rendered ineffectual by the fact that the Mayor had no power to make the appointment, even if that could be shown to be the case. His authority in that respect could not be tried on a challenge to the array of jurors. If it could be, the same investigation might be required as to every officer through whose intervention jurors are to be selected, drawn and summoned, in every case to be tried; which would render trials interminable and so obstruct the administration of the laws as to render them contemptible and useless. This challenge was properly overruled.

After the indictment was presented it was, upon motion of the district attorney, ordered by the Court of General Sessions to be sent to the Court of Oyer and Terminer, held in and for the county of New York, to be determined according to law.

The record produced shows these facts, and that the prisoner was arraigned upon it in the Court of Oyer and Terminer, on the 25th of October, 1875. His counsel now objects that this court had no jurisdiction over the case, because it does not appear by the record that the order was entered in the minutes of the Court of Sessions, and that it could only have sent the indictment to the next Court of Oyer and Terminer. As it does not appear that the order was not entered in the minutes of the Court of Sessions, that may now be presumed to have been done, from the fact that such an order was made. The objection should have been made, if it had any foundation whatever to stand upon, when the fact could have been shown, and the objection, probably, obviated by proof. It is too late to raise it now for the first time. It is also objected that the Court of Sessions could not transfer the indictment until the end of its term. But if the objection could be sustained, there is nothing in the record showing that it did that before the end of the term. The object of the statute was to provide for the speedy trial of indictments found, but not disposed of, in the Court of Sessions. For that reason it restrained the exercise of the power, to transfer to the next Court of Oyer and Terminer to be held in the County. Its object was to prevent delay, by accelerating the

time for trial. (3 R. S. [5th ed.], 303, § 7.) And it was within the spirit of the enactment to send the case to the Court of Oyer and Terminer, even if it was at the time in session. What the Legislature meant by the terms used, was, the next court at which the indictment could be tried. The first court at which that might be done, and the court to which the transfer of this indictment was made, was a court of that description. Indeed, there is nothing in the record from which it can be supposed, that the term of Oyer and Terminer had commenced when the order was made for transferring the indictment. But if there was, it simply presented a case of irregularity, in the exercise of an authority which the Court of Sessions clearly possessed, which did not affect the jurisdiction of the Court of Oyer and Terminer. If there had been any thing in this objection it should have been presented to that court, when it might have been corrected. By failing to do that, and pleading in abatement, and going to trial, it was clearly waived. (*People* v. *Allen*, 43 N. Y., 28, 31.)

The indictment, in the first count, charged the prisoner with the commission of the crime of burglary, by feloniously and burglariously breaking into the store of James H. Noe, having in it at the time goods, merchandise and valuable things for use, sale, and deposit, the property of James H. Noe, with the intent to steal, take and carry away the same. The facts alleged in this portion of the indictment were sufficient to constitute the offense of burglary in the third degree. It was then charged that while the prisoner was engaged in the commission of that offense, he willfully and feloniously made an assault upon James H. Noe, by striking him upon the head with a piece of iron, and inflicting upon him a mortal wound, of which he afterward died; and that in that manner, while the prisoner was engaged in the commission of the burglary, he willfully and feloniously murdered and killed James H. Noe, against the form of the statute, etc.

The second count charged the prisoner with the commission of the crime of robbery, by assaulting James H. Noe, and against his will and by violence to his person, robbing him of and stealing his watch. It then proceeded in a similar form to the first count, and charged that while the prisoner was engaged in committing that offense, he willfully and feloniously assaulted James H. Noe with a

piece of iron, and thereby inflicted a mortal wound upon his head, of which he afterward died. This count concluded as the other did, by charging the prisoner, upon those acts, with the crime of murder.

For the reason that these counts, by way of introduction to the charge of murder, alleged that the prisoner, at the time when the mortal blow was inflicted, was engaged in the commission of burglary, or robbery, or both offenses, they are objected to in his behalf, as bad for duplicity. And it is undoubtedly true, that the authorities are, as the counsel has claimed them to be, that two felonies cannot properly be alleged in one count of an indictment. But it was clearly not the purpose of the public prosecutor, or of the grand jury, to charge the prisoner with the commission of two distinct felonies, and try him for both under either count of the indictment. The charge against the prisoner was not burglary nor robbery, but the crime of murder; and if it had been committed by him at all, as the act was described in these counts, it was attributable to the circumstance that he was at the time engaged in the commission of another felony; and that could only appear by setting forth such felony and connecting the act with it, which resulted in the homicide. There was no other way in which that could be done, than by first showing the prisoner to have been engaged in committing a felony, and then charging that in the execution of the purpose to perpetrate that crime, he inflicted a mortal wound upon James H. Noe, which resulted in his death. The statute has been so framed as to require this combination of the felony with the mortal act, to create the crime of murder in the first degree, where death is not the result of deliberation and premeditation. The third class of cases enumerated and described by the statute now and at the time of this homicide, defining the offense of murder, characterizes the act as murder in the first degree, which produces the death of another, when it shall be inflicted by a person engaged in the commission of any felony, even though it shall be unaccompanied with the design to take life. (Gen. Stats. N. Y., vol. 9, 698, § 1.) And it was evidently the design of the prosecution, by minutely setting out the burglary and robbery, to present a case against the prisoner under this provision. That could properly be done in no other way; for the

law upon this subject as it has long been settled, is that "an indictment upon a statute must state all such facts and circumstances as constitute the statute offense, so as to bring the party indicted precisely within the provisions of the statute." "If the statute is confined to certain classes of persons, or to acts done at some particular time or place, the indictment must show that the party indicted, and the time and place when the alleged criminal acts were perpetrated were such as to bring the supposed offense directly within the statute." (*People* v. *Allen*, 5 Denio, 76, 79, 80.) Within this rule the counts objected to were properly framed, for in no other way, could the statutory offense have been described. If the burglary in the one case, or the robbery in the other, had not been charged, the homicide would have been clearly reduced below the grade of murder in the first degree, although the means and act of killing remained the same. It possibly may be true that more was stated than was strictly necessary, though that is not intended to be affirmed as to these counts. But if that be true, the prisoner was in no way injured by this degree of particularity. It was rather a benefit to him, because it gave him a more ample and complete description of the offense charged to have been perpetrated by him, and in that way afforded him a better opportunity for making his defense. It was no legal objection to the indictment that the crime was described more fully than the law required it to be done; mere surplusage presents no legal cause for the reversal of a conviction. (*Lohman* v. *People*, 1 Comst., 379, 383.)

By the bill of exceptions, claimed to be irregularly before this court, two exceptions were taken by the prisoner's counsel to the refusal of the court to charge certain requests made by him. One was abandoned at the argument, and therefore need not be further referred to. The other requested the learned justice — whose very clear and able charge has been returned in the case — to instruct the jury that no conviction could be had for murder in the first degree under the first count of the indictment. This was declined, and the counsel for the prisoner excepted. It has not been claimed that the evidence, which is not before the court, was insufficient to justify the jury in concluding that the prisoner took the life of James H. Noe while he was engaged in the commission of the burglary, as charged in that count; but that the count itself was bad

because the burglary was alleged in it. That point requires no further consideration than it has already received. It cannot be sustained; and the instruction was properly refused. When the prisoner's plea in abatement was overruled, he declined to plead to the indictment, and the court, as was its duty under the statute, ordered the plea of not guilty to be entered; and the trial proceeded upon such a traverse of the indictment. The formal entry of the plea is sufficiently shown by the record, which states the direction of the court, and also shows the formal trial of the prisoner upon the assumption of the existence of that plea in the case. Every advantage was secured to him, which he could possibly have desired from the most formal statement and entry of this plea.

It is further objected that no *similiter* was added on the part of the prosecution, by which the people placed themselves upon the country, as the plea of not guilty did the prisoner. That was the merest matter of form imaginable, and its omission could not prejudice the prisoner as long as his trial was had precisely the same as though this formal proceeding had been observed. These formal objections have all been removed by the statute, which, after providing that no indictment shall be deemed invalid, or the judgment, or other proceedings affected, by reason of certain enumerated omissions contains the general provision which deprives the prisoner of the right to rely on any other defect or imperfection in matters of form, which shall not tend to his prejudice. (3 R. S. [5th ed.], 1019, 1020, § 54, sub. 4.)

The jury rendered a verdict of guilty of murder in the first degree, as charged in the indictment. And as one count charged the prisoner with that crime, because he took the life of his victim while committing a burglary, the second while committing a robbery, and the third with deliberation and premeditation, the verdict is objected to as an inconsistent and improper one. But as it was neither impossible nor improbable, that the prisoner was committing both burglary and robbery when he inflicted the mortal blow, and at that time was actuated by a deliberate and premeditated purpose to take life, the verdict cannot be held to be necessarily inconsistent with the indictment. The prisoner may very well have been guilty of all the charges contained in these three counts, when he inflicted the mortal wound upon the deceased;

for he may have been engaged in both burglary and robbery, with a deliberate and premeditated design to take the life of the person resisting him in the execution of those felonies. The law requires no particular period for, or amount of deliberation to constitute the crime of murder in the first degree, even when the nature of the offense depends wholly upon the existence of that circumstance. It is sufficient that the fact of deliberation existed in the case, combined with the intent to take life, and that the mortal blow or wound was given in consequence of that intention and deliberation, and for the purpose of executing such intention. What the law has required is, that both deliberation and premeditation shall precede the act of taking life, and that the act shall execute the purpose so formed. And that may very well have been the nature of the prisoner's act, while he was at the same time engaged in the commission of the burglary and robbery, charged in the indictment, for the purpose of making out the existence of the offense under the other provision of the statute.

But if the first and second counts, for any reason, cannot be sustained, even then the conviction was perfectly good under the third count; against which no objection whatever has been made. And, for the purpose of sustaining the judgment, the verdict may properly be applied to that count. (*Guenther* v. *People*, 24 N. Y., 100.)

After a very full examination of the points presented in the prisoner's behalf, it is quite clear that no error has been established in the case. But one duty has, therefore, been left to the court, and that is to affirm the judgment and remit the case to the Court of Oyer and Terminer, to designate the day for its execution, and carry the same into effect.

DAVIS, P. J., and BRADY, J., concurred.

Judgment affirmed.